[Crim. No. 17546. In Bank. Nov. 1, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
CORINTHIANS CANFIELD, Defendant and Appellant.

COUNSEL

Leslie C. Nichols, under appointment by the Supreme Court, for Defendant and Appellant.

Richard S. Buckley, Public Defender (Los Angeles), Harold E. Shabo and Martin Stein, Deputy Public Defenders, and Rose Elizabeth Bird as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, William E. James and Edward P. O'Brien, Assistant Attorneys General, Derald E. Granberg, Thomas P. Dove and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McCOMB, J.—Defendant appeals from a judgment (order granting probation) of conviction entered upon a jury verdict finding him guilty of auto theft (Veh. Code, § 10851).

*Facts*: On the afternoon of October 6, 1971, Joan Petroni parked and locked her 1967 green Buick automobile in front of her home in San Jose and took the keys into the house. The following morning the Buick was gone.

Officer Robert Arnold, of the California Highway Patrol, testified that early on the morning of October 7, 1971, he observed two automobiles apparently racing each other at speeds of approximately 100 miles an hour. One of them was a green Buick. The officer immediately gave chase, activating his rear amber and front red lights. After he had followed the cars for about eight miles, both of them pulled off the roadway onto the dirt shoulder. The officer got out of his vehicle and started toward the green Buick. The driver of that car looked directly at the officer and then sped away. The officer ran back to his car at once and again gave chase. After traveling another mile and a half, at speeds of up to 115 miles an hour, the Buick turned onto a side road and eventually spun out of control and into the Delta Mendota Canal. Miraculously, the driver (defendant) was uninjured.

The Buick was the one which belonged to Ms. Petroni. Following its removal from the canal, Officer Arnold examined it and, after observing that there was no key in the ignition, discovered that it had been hot-wired.

Defendant testified that he had purchased the Buick around 3 a.m. on October 7, 1971, for $1,300 in cash from one Levicks at Mickey's Blue Room, a bar in East Palo Alto. He said that he had brought a little over $500 with him to the bar around 1 p.m. on October 6, 1971; that he gambled there and had about $1,900 at the time he bought the car; and that later, after buying the car, he left $600 with his girl friend at her home and retained only $10 in his pocket. He said that he then set out for Fresno, where he had formerly lived.

According to Officer Arnold's testimony, defendant told him shortly after his arrest that he had seen in the San Jose Mercury on October 6, 1971, an advertisement of the car for sale and that he later purchased it from a man named "Levitts" at Mickey's Blue Room. At his trial, defendant admitted that that was what he had told the officer; but he said that it was not true, explaining he had thought he would be released from jail sooner if he lied than if he told the truth.

Defendant testified that he had never met Levicks prior to the night he bought the car, but said that he had let people know some time before that he was interested in buying a car and that one of his friends had told him about the car Levicks had for sale and arranged for the two to meet at Mickey's Blue Room. The car supposedly belonged to Levicks' brother, who, defendant was told, was in the service in Texas at that time. Defendant drove the car around the block to test it. Then, after being assured by Levicks that it was not a stolen vehicle and that the brother would send him the automobile registration and the trunk key by mail, he completed the transaction, paying the full amount of the purchase price in cash. Defendant had been driving the car for five and one-half hours by the time it spun out of control and went into the canal; and he testified that during all that time he never once turned the motor off, because he was afraid he would not be able to get it started again.[1]

---

[1]Defendant testified that before he purchased the car, Levicks told him he had left the motor running because the battery was weak; that after the transaction was completed, he and Levicks went back inside the bar, where defendant bought them each a beer; that before doing so, he locked the doors and took the key out of the ignition but left the motor running; that he later had the battery replaced with a used battery, which he bought for $5; and that he left the motor running (even while the battery was being replaced) from the time he purchased the car until it finally came to rest in the canal, because he felt the battery (the replacement battery, as well as the old one) was weak. He said that the service station attendant had tried to sell him a new battery for $39, but he told the man he wanted something cheaper.

Defendant also testified that before he purchased the car he noticed that some of

Defendant further testified that just after the car went into the canal, he grabbed the key out of the ignition, put it in his pocket, and swam to the shore and that while he was at the jail he turned the key over to an unknown officer there. He denied that the car had been hot-wired.

In explaining why he had sped off after stopping the car on Officer Arnold's signals to stop, defendant testified that although he knew he was speeding, he had no idea why the officer had been chasing him; that he recalled he had had trouble with the San Mateo Police Department; and that the officer had his hand quite close to his gun, and he was afraid the officer might kill him.

On cross-examination, defendant was asked how much he had won at gambling between March (when he moved to the Bay Area from Fresno) and October of 1971. Defendant gave an estimate of $75,000 and said that he had spent some of the money on expenses, such as clothing and jewelry, and had lost the rest in gambling. Defendant was then asked if he had ever filled out a financial eligibility statement. Following a conference at bench, the trial court ruled that defendant could be impeached by the form he had signed for the public defender pursuant to section 27707 of the Government Code.[2]

Defendant had initially been interviewed at the jail by a legal aide named John Porter, who was a recent law school graduate working for the public defender while awaiting the results of the bar examination. Mr. Porter had asked whether defendant could afford private counsel and was told

---

the nuts that go on the bolts which attach the tires to the wheels (at least one on each wheel) were broken or missing and that he had had a feeling that the tires might be loose. Defendant said that after he bought the car and was driving it, he felt as though the tires were wobbling, and he stopped to determine if they were loose. He found that they were not loose and said that they did not wobble after he started moving again until he reached a speed of 65 to 70 miles an hour.

[2]Section 27707 reads: "The court in which the proceeding is pending may make the final determination in each case as to whether a defendant or person described in Section 27706 is financially able to employ counsel and qualifies for the services of the public defender. The public defender shall, however, render legal services as provided in subdivisions (a), (b) and (c) of Section 27706 for any person the public defender determines is not financially able to employ counsel until such time as a contrary determination is made by the court. If a contrary determination is made, the public defender thereafter may not render services for such person except in a proceeding to review the determination of that issue or in an unrelated proceeding. In order to assist the court or public defender in making the determination, the court or the public defender may require a defendant or person requesting services of the public defender to file a financial statement under penalty of perjury."

By ordinance, Santa Clara County requires the public defender to obtain such a statement.

that he could not. After noting that defendant owned little more than a 1954 Oldsmobile, Mr. Porter asked him to sign the financial eligibility form. The form provided that the statement was being made under penalty of perjury, but at no time did Mr. Porter read the form to defendant or explain that he was signing under oath.

Defendant was charged with auto theft (Veh. Code, § 10851) and receiving stolen property (Pen. Code, § 496). He was, as hereinabove noted, found guilty of the auto theft charge, but he was acquitted on the other. He was granted three years' probation, contingent upon his serving one year in the county jail.

*Questions*: First. ▇ *Is defendant's financial eligibility statement protected by the lawyer-client privilege?*

*Yes*. It is clear from the circumstances under which the statement was given that it was given in confidence[3] (see Evid. Code, § 952)[4] and that defendant's purpose was to retain the public defender to represent him in the criminal proceedings against him. Under sections 951 and 954 of the Evidence Code, therefore, any disclosures made by defendant in the course of the interview were privileged and could not be revealed without his consent.[5]

---

[3] At the time the statement was given, defendant and a representative of the public defender were alone in an interviewing room at the jail with the door closed.

[4] Section 952 provides: "As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes advice given by the lawyer in the course of that relationship."

[5] Section 951 provides, in part: "As used in this article, 'client' means a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity . . . ."

Section 954 provides: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by:

"(a) The holder of the privilege;

"(b) A person who is authorized to claim the privilege by the holder of the privilege; or

"(c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure."

■ The lawyer-client privilege is, indeed, so extensive that where a person seeks the assistance of an attorney with a view to employing him professionally, any information acquired by the attorney is privileged whether or not actual employment results. (*Sullivan* v. *Superior Court,* 29 Cal.App.3d 64, 69 (4) [105 Cal.Rptr. 241].)

In indicating the reasons for the privilege, this court said in *City & County of S.F.* v. *Superior Court,* 37 Cal.2d 227, 235 [12] [231 P.2d 26, 25 A.L.R.2d 1418]: "The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence. Adequate legal representation in the ascertainment and enforcement of rights or the prosecution or defense of litigation compels a full disclosure of the facts by the client to his attorney. 'Unless he makes known to the lawyer all the facts, the advice which follows will be useless, if not misleading; the lawsuit will be conducted along improper lines, the trial will be full of surprises, much useless litigation may result. Thirdly, unless the client knows that his lawyer cannot be compelled to reveal what is told him, the client will suppress what he thinks to be unfavorable facts.' [Citation.] Given the privilege, a client may make such a disclosure without fear that his attorney may be forced to reveal the information confided to him. '[T]he absence of the privilege would convert the attorney habitually and inevitably into a mere informer for the benefit of the opponent.' "

■ A relationship of trust and confidence between an indigent defendant and his attorney is now, in view of this court's determination that a defendant has no constitutional right to defend *pro se* at his trial, considered indispensable. (See *Drumgo* v. *Superior Court,* 8 Cal.3d 930, 938 [106 Cal.Rptr. 631, 506 P.2d 1007] [dissenting opinion].) And it is clear that if an accused is informed that the first information he provides his attorney is not privileged, he would not have the trust in his counsel so essential in providing effective representation. The problem is particularly serious with respect to indigents represented by the public defender, there apparently being a tendency on the part of many such defendants to regard the public defender as an arm of the state working closely with the prosecutor. (See Wilkerson, *Public Defenders as Their Clients See Them* (1972) 1 Am. J. Crim. L. 141.)

In *United States* v. *Kahan,* 415 U.S. 239 [39 L.Ed.2d 297, 94 S.Ct. 1179], the Supreme Court of the United States held that the trial court had properly admitted evidence that the defendant, a former immigration inspector charged with illegally receiving gratuities for official acts, had falsely stated at his arraignment, when questioned by the court, that he

lacked funds to employ an attorney. The trial court had appointed counsel to represent the defendant on the basis of such statements. The statements were admitted as false exculpatory statements showing the defendant's consciousness that certain bank deposits were incriminating and as evidence of wilfulness in making statements before the grand jury with knowledge of their falsity.[6] There are, however, important differences between *Kahan* and the present case.

To begin with, in *Kahan* the statements were made by the defendant in open court and were not made with any expectancy that they would be regarded as confidential. In no way could it be said that they were clothed with a lawyer-client privilege. In addition, in *Kahan* the statements made by the defendant while asking that the court appoint counsel to represent him were, to his knowledge, false. This is the principal ground upon which the Supreme Court of the United States made its ruling, saying at page 243 of 415 U.S. [page 301 of 39 L.Ed.2d]: "The protective shield of Simmons [*Simmons* v. *United States*, 390 U.S. 377 (19 L.Ed.2d 1247, 88 S.Ct. 967)] is not to be converted into a license for false representations on the issue of indigency free from the risk that the claimant will be held accountable for his falsehood." It was specifically pointed out in *Kahan* that "the incriminating component of [the defendant's] pretrial statements derives not from their content, but from [the defendant's] knowledge of their falsity." (Page 243 of 415 U.S. [page 301 of 39 L.Ed.2d].) In the present case, however, the prosecutor used the *content* of defendant's statement to incriminate him, and there is no contention that defendant made false representations on the issue of indigency. Rather, the prosecution took the position that defendant's representations in his financial eligibility statement were true and could be used to impeach his contrary testimony at trial.

The trial court ruled that under section 27707 of the Government Code defendant's financial eligibility statement became a public record and that it was therefore not protected by the lawyer-client privilege. This ruling, however, is erroneous. Although section 27707 provides that "the court or the public defender may require a defendant or person requesting services of the public defender to file a financial statement under penalty of perjury," there is nothing in the section to require that the public defender turn over to the court a financial eligibility statement obtained by him. Presumably, if there is doubt that the defendant is eligible to have

---

[6]In the present case, if defendant's financial eligibility statement were admissible in evidence, his failure to list the car thereon as one of his assets could be used by the prosecution to show that he did not consider the car as belonging to him and that therefore he must have stolen it.

the public defender represent him, the court, which is empowered to make the final determination, may make oral inquiry of the defendant with respect to his assets or, even if the defendant has given a financial eligibility statement to the public defender, require that he give another to the court. But the language of section 27707 does not reveal an intention by the Legislature that the lawyer-client privilege be abrogated with respect to any financial eligibility statement given by a defendant in confidence to the public defender, as was the case here. In any event, even if it were held that the court could require the public defender to turn over to it a financial eligibility statement given by a defendant, the sole use which the court could make of the statement would be to enable it to determine whether the defendant was eligible for the services of the public defender[7] and not, as here, to turn the statement over to the People to use in the prosecution of the case in chief against the defendant.

In view of our conclusion that defendant's financial eligibility statement is protected by the lawyer-client privilege, we deem it unnecessary to discuss his further contentions that forcing disclosure of the statement at his trial was a violation of his rights under the Fifth and Sixth Amendments of the United States Constitution, as well as article I, section 13, of the California Constitution, and also denied him equal protection of the laws.

Second: *Should the judgment (order granting probation) of conviction entered upon the jury verdict finding defendant guilty of auto theft be reversed?*

*No.* Defendant, it will be recalled, was apprehended in a stolen, hot-wired vehicle after driving at speeds in excess of 100 miles an hour in an attempt to avoid being captured by the pursuing police officer. Furthermore, his testimony that he purchased the car for $1,300 cash in a bar from a total stranger, with the understanding that the automobile registration and the trunk key would be sent to him by mail at a later date, is inherently incredible. Under the circumstances, there being no reasonable probability that the jury would have reached a verdict more favorable to defendant had his statement not been received in evidence, the error was harmless, and affirmance of the judgment is required. (Cal. Const., art. VI, § 13; *People v. Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) Moreover, even if we were to conclude that the admission of the statement violated defendant's rights under the federal Constitution, we are convinced that

[7]That determination had been made with respect to defendant long before the trial.

the error was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

The judgment (order granting probation) is affirmed.

Wright, C. J., Tobriner, J., Mosk, J., and Burke, J., concurred.

SULLIVAN, J.—I concur and I agree generally with the rationale by which the majority dispose of the case before us. But I do not agree with the broad holding that the majority opinion appears to announce and therefore feel I should emphasize my own views.

I agree that under the particular circumstances of this case, the financial eligibility statement signed by defendant and the communications between defendant and Mr. Porter (the public defender's legal assistant) relating to defendant's financial eligibility are protected by the attorney-client privilege. These communications took place in the privacy of an interviewing room in the Santa Clara County jail. Defendant then and there apparently believed that he was being represented by the public defender and therefore, in response to Mr. Porter's questions, freely and readily provided the information appearing on the statement. He was not told at any time that the purpose of the document was to determine whether or not he qualified for the appointment of the public defender as counsel for his defense on the basis of his indigency. During his interview with Mr. Porter, who was not a member of the State Bar, defendant was not aware, nor was he ever made aware, of the fact that his communications with the interviewer were other than those of a confidential nature, made in the course of an attorney-client relationship. Under these circumstances, it is apparent that defendant thought that the communications were confidential and he had a reasonable expectation that they would remain so. (Evid. Code, § 952; *City & County of S.F.* v. *Superior Court* (1951) 37 Cal.2d 227, 234-235 [231 P.2d 26, 25 A.L.R.2d 1418].)

On the other hand, if the procedures followed in situations like the present one are such that the defendant is made aware of their nature and purpose and understands that he will not be represented by the public defender until he has established his indigency, then any information given by him either orally or in writing for that purpose cannot properly be considered a "confidential communication" covered by the attorney-client privilege. (8 Wigmore, Evidence (McNaughton rev. ed. 1961) § 2304.) Under such circumstances, information given by the defendant to establish his financial eligibility for free legal assistance, in my view, would not

constitute "information transmitted between a client and his lawyer *in the course of that relationship* . . ." (Evid. Code, § 952 (italics added)). However, as previously stated, the particular circumstances of the case at bench do not warrant the conclusion that defendant was aware of the precise purpose of his interview with Mr. Porter. Accordingly I think that we should emphasize that our holding herein is limited to the specific facts of the case before us.

Clark, J., concurred.