[Civ. No. 65192. Second Dist., Div. Seven. June 22, 1983.]

Estate of CONCHA CRISTINA KIME, Deceased.
ALBERT L. KIME, Petitioner and Appellant, v.
RANDOLPH J. BARNARD, Petitioner and Respondent,
BETTY J. HYDE, Claimant and Respondent.

■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Alexander M. Gelman and Gelman, Grasfeld & Termini for Petitioner and Appellant.

No appearance for Petitioner and Respondent.

Gregg Vorwerck and Richard E. Smith for Claimant and Respondent.

**OPINION**

**SCHAUER, P. J.**—■■ ■■ ■■ ■■ Albert L. Kime, decedent's husband, appeals from a judgment (1) denying his petition for revocation of probate of purported lost will and (2) determining heirship.[1]

### FACTUAL HISTORY

Albert Kime (Kime) and Concha Kime (Decedent) were married in 1963. In 1977 Kime filed a petition for dissolution of marriage. On August 18, 1978, Decedent executed a witnessed last will and testament (the Will). On a Wolcott form, the Will purported to appoint Decedent's close personal friend, Betty Jean Hyde (Hyde) as executrix, but the document failed to be explicit in naming a beneficiary or in reciting dispositive provisions; it made no mention of Kime or of Decedent's only issue, Randolph Barnard (Barnard). The Will, reproduced as appendix A hereto, states in relevant part (with underlined words written in by Decedent):

"I, Concha Cristina Kime, a resident of 3135 Bellflower Blvd., Long Beach, California declare this to be my last Will and revoke all other Wills previously made by me:

FIRST:

My home (residence) and all effects therein & automobile, 1973 Caprice auto License 927.HHT.

---

[1]Appellant also purports to appeal from the denial of his motion for a new trial. An order denying a motion for a new trial is not appealable. (Code Civ. Proc., § 904.1; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 71, pp. 4084-4085.)

_____ : I appoint <u>Betty J. Hyde</u>

as Execut<u>ris</u> [*sic*] of this Will <u>& last Testament</u>"

 Sometime between July 2 and August 2, 1979, Kime's attorney, Carl M. Bergkvist (Bergkvist), prepared a "Stipulation re Support and Division of Community Property" (the Stipulation) providing, inter alia, that Decedent was to receive the family residence as her separate property and Kime was to receive certain securities as his separate property. On August 2, 1979, during a recess in the course of a judicial hearing on the Stipulation, the parties and their respective attorneys reviewed, and then signed, the Stipulation. Shortly prior to the execution of the Stipulation, Decedent signed over to Kime the securities. Also on that date Kime executed, and Bergkvist notarized, a quitclaim deed to Decedent conveying the family residence (the Quitclaim Deed). The Stipulation was presented to the dissolution court when it reconvened after the recess. The court then heard further testimony concerning several unresolved property division issues, and stated: "I assume that there will at long last be prepared a decree spelling out the details of the interlocutory being granted and the specifics of the stipulation." Bergkvist undertook to prepare the interlocutory judgment of dissolution incorporating the Stipulation.

 On October 17, 1979, Bergkvist wrote to Wilton Roddy (Roddy), Decedent's attorney, enclosing the proposed interlocutory judgment, the executed Quitclaim Deed, and a "Note Secured by Deed of Trust" for $8,074.92, the letter authorizing Roddy to record the deed "upon Mrs. Kime executing the Note and Deed of Trust and returning same to me." The purpose of the note was to equalize the division of community assets pursuant to the judgment. Bergkvist also requested that, if the judgment was correct, Roddy sign and return the original to Bergkvist along with the executed note.

 Less than two months thereafter, Decedent was killed in an automobile accident, on November 30, 1979, without having executed the note. The original of the Will was never found. On December 13, 1979, Roddy filed the interlocutory judgment. On or about February 8, 1980, the parties through their attorneys stipulated to have the interlocutory decree set aside and cancelled.

 Following an uncontested hearing on Hyde's petition for probate of lost will, the Will was admitted to probate. On February 8, 1980, Kime filed a "Petition for Revocation of Probate of Purported Lost Will" (the Petition for Revocation) alleging, inter alia, that the document did not qualify as a will as it failed to recite dispositive provisions. On May 7, 1980, Barnard filed a "Petition for Determination of Entitlement to Estate Distribution"

under Probate Code section 1080 (the Entitlement Petition), claiming, inter alia, that Barnard was a pretermitted heir, and that the residence subject to the Will was separate in nature in accordance with the Stipulation. Kime's and Barnard's petitions were heard on November 12 and 13, 1980, respectively. At the hearing on the Entitlement Petition, the parties first stipulated that Barnard was a pretermitted heir within the meaning of Probate Code section 90. Over Kime's objection, the court allowed Bergkvist to testify as to matters concerning the transmutation of community property to separate property in accordance with the Stipulation. The court held that Barnard was a pretermitted heir, and that the Stipulation and the Quitclaim Deed had effectively converted the residence from community to separate property. The hearing on the Petition for Revocation concerned the issue of the interpretation of the Will in view of the absence of explicit dispositive provisions. Several witnesses testified, over Kime's objection, as to Decedent's oral statements indicating her intent to will to Hyde the residence, the effects therein, and the automobile. The court found that Hyde took under the Will (subject to Barnard's rights as pretermitted heir), and denied the Petition for Revocation. Kime's motion for new trial and stay of execution was denied, and Kime appeals.

We affirm the denial of the Petition for Revocation. But we conclude that appellant is correct in asserting a violation of the attorney-client privilege and, hence, we reverse and remand as to the trial court's determination on the Entitlement Petition and estate distribution.

### PETITION FOR DETERMINATION OF ENTITLEMENT TO ESTATE DISTRIBUTION

*Factual Background*

At the hearing on the Entitlement Petition, counsel for Barnard called Bergkvist as his first witness. Bergkvist stated at the outset of his testimony that all matters between Kime and himself fell within the attorney-client privilege and, unless waived, he was not able to discuss them in court. The following dialogue ensued:

"MR. CHAPMAN [attorney for Barnard]: Your honor, our position is that the attorney-client privilege has been waived by Mr. Kime's attack upon a property settlement agreement entered into in this very courthouse.

"MR. VORWERCK [attorney for Hyde]: In addition, Your Honor, the exception is waived pursuant to section 961 of the Evidence Code where the validity of the writings affected a property interest is an issue, and I believe it is in this case.

"MR. MIKKELSON [attorney for Kime]: Your Honor, I would not be prepared to accept a stipulation to a waiver of attorney-client privilege.

"I'm knowledgeable of those matters sought by counsel here, but just on general principles, I could not waive attorney-client privilege.

"THE COURT: It would appear that this is very similar to the doctor-patient privilege, which is waived when an individual brings a lawsuit resulting for [sic] personal injuries and the doctor is called to give depositions and testimony.

"I don't think Mr. Kime can hide behind that privilege and still say that the property is community. I think there was a waiver.

"The witness will be instructed to proceed.

"MR. MIKKELSON: We request that our objection be noted.

"THE COURT: Automatic exception to all rulings of the court."

Bergkvist proceeded to testify. His examination included, inter alia, the exchanges recited in the margin.[2]

---

[2]"Q. Did [Kime] at any time voice any objections to you concerning [the Stipulation] prior to signing it?
"A. Well, it's rather difficult to answer.
"He signed it, and I assume that he agreed with it, but there were not—
"Q. No. We don't want you to assume.
"A. There were several matters during the course of the divorce that Mr. Kime did not like.
"Q. I am only referring to this document and any objections he may have voiced to you about this document.
"A. He did not like the value of $70,000 on the house.
"Q. He voiced that objection to you?
"A. He made that statement to me that I recall.
" . . . . . . . . . . . . . . .
"Q. And [Kime] voiced an objection to you concerning [the valuation of the house]?
"A. He thought it was worth more.
" . . . . . . . . . . . . . . .
"Q. Did you explain to Mr. Kime what you meant by sole and separate property?
"A. I don't think I explained it the way you asked me the question, but what we were doing was dividing the property.
"Q. Okay. Did you make that clear to Mr. Kime that you are [sic] dividing up community property?
"A. I think I did.
"Q. And that you were converting it into separate property?
"A. Well, I certainly tried to do that.
"Q. Okay. Now, when you got over to E.F. Hutton, did Mr. Kime voice any objections with this agreement?
"I mean, what I'm getting at—
"A. I don't believe we discussed this agreement at all at that time at E.F. Hutton.
"Q. Did he at any time object to his signing the quitclaim deed to the wife?
"A. He signed it, but I indicated he thought the house was worth more.

*Issues on Appeal as to Attorney-client Privilege*

█ The principal issue presented is whether the testimony set forth in footnote 2, or any part of it, was protected by the attorney-client privilege

" . . . . . . . . . . . . . . . . . . . . . . .

"Q. Is it your testimony that on August 2, 1979, Mr. Kime read the stipulation that has been referred to?

"A. Yes. He read it before he signed it.

"Q. And did it appear to you that he signed it of his own free will?

"A. Yes.

"Q. Did it appear that anyone exerted any force of any nature to induce Mr. Kime to sign that document at that time?

"A. No.

"Q. Did he seem upset or emotionally distraught at the time he signed it?

"A. No.

" . . . . . . . . . . . . . . . . . . . . . . .

"Q. In the interlocutory judgment of dissolution . . . there is a paragraph indicating that both parties waive the findings of fact and conclusions of law and right to appeal and right to a new trial.

"Did you explain that to Mr. Kime at any time?

"A. The best of my recollection, on our last meeting when we got all of the figures finally completed, which were in my notes, I told him that we could get the matter over with sooner if we would waive certain rights and that Mr. Roddy said that his client had already agreed to waive the rights, and he said, 'Let's get it over with,' and to the best of my recollection, something to that effect, that we would waive those rights so we could get the final entered without waiting 60 days.

"Q. Mr. Kime expressed that to you?

"A. Yes.

"Q. Did he at any time subsequent to August 2nd of 1979—and I'm referring to Mr. Kime—call you or contact you with the express intention of stopping the process of this and reconciling with his wife or getting back together?

"A. No. No.

"Q. Did he ever request that you not file the interlocutory judgment of dissolution?

"A. No.

"Q. Did he after August 2nd of 1979, ever contact you and request that you set aside the stipulation re support and division of community property? [¶] A. No.

"Q. And to the best of your knowledge, there never was a final resolution of the household furnishings matter; is that correct?

"A. No. To the best of my recollection, there was a resolution that Mr. Kime told me that they had agreed that she would pay him the sum of $700, and he received a few items, and that she would receive the rest.

"Q. Do you know if he ever got those items that he was to get?

"A. No, I don't, but I put that figure in the interlocutory decree, and I verified it with Mr. Roddy, and he said his client told him the same thing.

"Q. Did you check with Mr. Kime in that matter?

"A. Mr. Kime told me.

"Q. I see.

"A. He called me first.

" . . . . . . . . . . . . . . . . . . . . . . .

"Q. Now, did you hear any objections from Mr. Kime concerning that interlocutory decree between October 17, 1979 and the date of the decedent's death, which was November 30, 1979?

"A. No.

"Q. No objections at all? [¶] A. No.

" . . . . . . . . . . . . . . . . . . . . . . .

"Q. Did Mr. Kime ever tell you that he had looked for a will?

and, if so, whether its admission was reversible error. The following issues must be considered in light of the attorney-client privilege as it exists in California:

1. Did the questions put to Bergkvist, or any of them, invade the attorney-client privilege?

2. Did the testimony fall under any statutory exception to the privilege?

3. Was the privilege waived by Kime?

4. Was admission of the testimony harmless error?

We conclude that the answer to the first question is "yes" and the answer to questions 2, 3 and 4 is "no," and hence we reverse the judgment.

*The Attorney-client Privilege in California*

The attorney-client privilege has been embedded in Anglo-Saxon jurisprudence for 400 years. (McCormick, Evidence (2d ed. 1972) § 87, pp. 175-179; *Prichard* v. *United States* (6th Cir. 1950) 181 F.2d 326, 328, affd. (1950) 339 U.S. 974 [94 L.Ed. 1380, 70 S.Ct. 1029]; *Baird* v. *Koerner* (9th Cir. 1960) 279 F.2d 623, 629 [95 A.L.R.2d 303]; *Willis* v. *Superior Court* (1980) 112 Cal.App.3d 277, 290 [169 Cal.Rptr. 301].) The privilege authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client, including legal opinions formed, and advice given, by the attorney. (Evid. Code, § 950 et seq.) Although the privilege belongs to the client, the attorney is required to invoke it on the client's behalf. (*Willis* v. *Superior Court, supra,* 112 Cal.App.3d at p. 290.)

The California Supreme Court has stated that the attorney-client privilege "is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence." (*City & County of S. F.* v. *Superior Court* (1951) 37 Cal.2d 227, 235 [231 P.2d 26, 25 A.L.R.2d 1418]; accord

---

"A. I recall one conversation Mr. Kime told me that he had gone to the car, and we needed the pink slip to the car, I believe, and I believe I asked him if there was a will there, and he said there was no will, but he had found other papers that were in the trunk of her car—Mrs. Kime's car.

"Q. Did he tell you what other papers he found?

"A. I don't recall. I think he referred to them as her papers.

"Q. Did he indicate to you that they were important papers?

"A. I got that impression just from the papers."

*People* v. *Canfield* (1974) 12 Cal.3d 699, 705 [117 Cal.Rptr. 81, 527 P.2d 633].) The public policy fostered by the privilege is to insure "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." (*Baird* v. *Koerner, supra,* 279 F.2d at p. 629; accord *Grand Lake Drive In* v. *Superior Court* (1960) 179 Cal.App.2d 122, 128 [3 Cal.Rptr. 621, 86 A.L.R.2d 129]; *Holm* v. *Superior Court* (1954) 42 Cal.2d 500, 506-507 [267 P.2d 1025], rehg. den. (1954) 42 Cal.2d 500, 521 [268 P.2d 722]; *Grover* v. *Superior Court* (1958) 161 Cal.App.2d 644, 646 [327 P.2d 212].) In California the privilege has been held to embrace not only oral or written statements but actions, signs, or other means of communicating information (*Ex Parte McDonough* (1915) 170 Cal. 230, 234 [149 P. 566]), and has even been referred to as "sacred."[3] (See also *Sullivan* v. *Superior Court* (1972) 29 Cal.App.3d 64, 71 [105 Cal.Rptr. 241]; *People* v. *Flores* (1977) 71 Cal.App.3d 559, 565 [139 Cal.Rptr. 546].) The reported decisions are not in accord as to whether the privilege should be strictly construed (*Grover* v. *Superior Court, supra,* 161 Cal.App.2d 644; *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355 [15 Cal.Rptr. 90, 364 P.2d 266]; *Merritt* v. *Superior Court* (1970) 9 Cal.App.3d 721 [88 Cal.Rptr. 337]) or liberally construed (*People* v. *Flores, supra,* 71 Cal.App.3d 559). The statute stands today substantially as first enacted in California in 1851 (Civil Practice Act, §§ 395-399, Stats. 1851, ch. 5, §§ 395-399, p. 114) and, when amended, it has been extended but never curtailed.[4] It is an important right given to protect a relationship that must be "sedulously fostered." (*Lohman* v. *Superior Court, supra,* 81 Cal.App.3d at p. 96; accord *People* v. *Canfield* (1974) 12 Cal.3d 699, 705 [117 Cal.Rptr. 81, 527 P.2d 633]; *Glade* v. *Superior Court* (1978) 76 Cal.App.3d 738, 743 [143 Cal.Rptr. 119].)

1. *Did the questions put to Bergkvist invade the attorney-client privilege?*

The attorney-client privilege is codified in Evidence Code section 954, which provides, in relevant part: "[T]he client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ." The term

---

[3]*People* v. *Kor* (1954) 129 Cal.App.2d 436, 447 [277 P.2d 94] (Shinn, J. concurring). Another court has pointed out, however, that "[p]erhaps the word 'sacred' is judicial hyperbole. As distinguished a juridical philosopher as Jeremy Bentham was vigorously opposed to the attorney-client privilege. (Bentham, Rationale of Judicial Evidence (1827) quoted in 8 Wigmore, Evidence (McNaughton rev. ed. 1961) § 2291, pp. 549-551.)" (*Lohman* v. *Superior Court* (1978) 81 Cal.App.3d 90, 94 [146 Cal.Rptr. 171].)

[4]For example, in 1957 it was extended to testimony offered by deposition (Code Civ. Proc., § 2016, subd. (b)); in 1967 it was amended to include "a legal opinion formed," protecting even an attorney's uncommunicated legal opinion (Evid. Code, § 952, as amended Stats. 1967, ch. 650, § 3, p. 2006).

"confidential communication between client and lawyer" is defined in Evidence Code section 952 as "information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."

The examination of Bergkvist clearly involved information transmitted between Kime and Bergkvist in the course of their relationship as client and lawyer, and legal advice given by Bergkvist to Kime in the course of such professional relationship. Although the question whether a communication was intended to be confidential is one of fact (see *Willis* v. *Superior Court, supra,* 112 Cal.App.3d 277), a communication between attorney and client is presumed confidential and the opponent of the claim of confidentiality has the burden of proof to establish that it was not. (Evid. Code, § 917.) In the instant case, nothing has been adduced to rebut such presumption.

## 2. *Does the testimony fall under any statutory exception to the privilege?*

The notarization by Bergkvist of the Quitclaim Deed releasing to Decedent the interest of Kime in the family residence provides the basis for the only statutory exception arguably applicable to the privilege. Evidence Code section 959 provides:

"There is no privilege under this article as to a communication relevant to an issue concerning the intention or competence of a client executing an attested document of which the lawyer is an attesting witness, or concerning the execution or attestation of such a document."

Initially, we will consider the Quitclaim Deed an "attested document" and Bergkvist an "attesting witness" for purposes of section 959 in light of the definition of those terms in the legal literature,[5] although the issue is not of certain resolution in view of the lack of pertinent California authority.

---

[5]An "attesting witness" has been defined as "a person who, at the request or with the consent of the maker, places his name on the document for the purpose of making thereby an implied or expressed statement that the document was then known by him to have been executed by the purporting maker. . . . [A]n *officer,* whose signature is required by law or by rule of court to give validity to a document or to enable it to be filed for a specific purpose, is an attesting witness [footnotes omitted]. . . ." (4 Wigmore, Evidence (Chadbourn rev. 1972) § 1292, pp. 707-708. Italics in original.) See also 7 Corpus Juris Secundum (rev. 1980) pages 777-778 and footnotes thereto; Black's Law Dictionary (4th ed. 1968) page 163, column 2; Ballentine's Law Dictionary (3d ed. 1969) page 108, column 1.

This determination is not crucial, however, since, as we shall explain, in the circumstances of this case Evidence Code section 959 does not render all of Bergkvist's testimony admissible.

The "attesting witness" exception codified in section 959 was based on prior case law fashioned under the pre-Evidence Code attorney-client privilege (Code Civ. Proc., § 1881, subd. 2.) Under that law the lawyer as attesting witness was allowed to divulge information received in his capacity as lawyer as well as in his role as attesting witness. In the case of *In re Wax* (1895) 106 Cal. 343, 347-348 [39 P. 624], the court held that "when the testator requested [his attorneys] to sign the will as attesting witnesses, he in effect consented that whenever the will should be offered for probate they might be called as witnesses and testify *to any facts, within their knowledge, necessary to establish its validity.*" (Italics supplied.) So too in the case of *In re Mullin* (1895) 110 Cal. 252, 254 [42 P. 645], it was held that "[w]hen a testator has requested his attorney to become an attesting witness to his will, *he thereby expressly waives the privilege.*" (Italics supplied.) Evidence Code section 959 narrowed the exception: a lawyer who acts as an attesting witness can divulge only information received in his capacity as an attesting witness and not in his capacity as a lawyer.[6]

In the instant case portions of Bergkvist's testimony went far beyond the type of communication about which an attesting witness would testify. The greater portion of Bergkvist's examination concerned not the Quitclaim Deed but the Stipulation and the interlocutory decree. Moreover, even if such examination is considered proper on the basis that the Quitclaim Deed is inextricably intertwined with the Stipulation and the interlocutory decree, a number of the questions put to Bergkvist clearly went beyond the subject matter of the validity and effective date of such documents.[7] Kime's objection to the value placed on the family residence, for example, was not communicated to Bergkvist as attesting witness but as Kime's attorney. Moreover, Bergkvist's testimony concerning the conversion of property from community property to Decedent's separate property had nothing to

---

[6]The California Law Revision Commission commented as follows on section 959: "This exception relates to the type of communication about which an attesting witness would testify. The mere fact that an attorney acts as an attesting witness should not destroy the lawyer-client privilege as to all statements made concerning the document attested; but the privilege should not prohibit the lawyer from performing the duties expected of an attesting witness. Under existing law, the attesting witness exception is broader, having been used as a device to obtain information which the lawyer who is an attesting witness received in his capacity as a lawyer rather than as an attesting witness. See In re Mullin, 110 Cal. 252, 42 Pac. 645 (1895)." (7 Cal. Law Revision Com. Rep. (1965) p. 177.)

[7]And some did not. For example, the questions concerning Bergkvist's observations of Kime's mental and emotional condition when he signed the Stipulation are clearly matters about which attesting witnesses usually testify.

do with the attestation. It was "advice given" by Bergkvist to Kime in the course of their attorney-client relationship. Similarly, Bergkvist's testimony concerning waiver of findings of fact, conclusions of law, and rights to appeal and to a new trial, was clearly privileged and hence improperly admitted legal advice given by Bergkvist to Kime in the course of their professional relationship.

In view of the foregoing, we conclude that most of Bergkvist's testimony does not fall under the exception to the attorney-client privilege contained in Evidence Code section 959.

3. *Was the privilege waived by Kime?*

A client may waive the attorney-client privilege by disclosing a significant part of the protected communication, or by consenting to such disclosure. (Evid. Code, § 912, subd. (a).) Although in the case at bench Kime neither disclosed "a significant part" of the communications at issue nor manifested his consent to such disclosure, the trial court, reasoning by analogy from the statutory patient-litigant exception[8] to the physician-patient privilege (Evid. Code, § 994), held that Kime waived the attorney-client privilege by tendering the issue of the nature of the property involved.[9] The difficulty with applying the foregoing rationale is that, for reasons of public policy, Evidence Code section 996 specifically establishes an exception to the physician-patient privilege, but, also for policy reasons, there is no similar statutory exception to the attorney-client privilege. While the purpose of the attorney-client privilege is to preserve and enhance the confidential relationship between attorney and client, the purpose of the physician-patient privilege is "to preclude the humiliation of the patient that might follow disclosure of his ailments." (*City & County of S. F.* v. *Superior Court, supra,* 37 Cal.2d at p. 232; accord *Moreno* v. *New Guadalupe Mining Co.* (1917) 35 Cal.App. 744 [170 P. 1088].) When the patient himself discloses his ailments by bringing a personal injury action in which they are in issue, he breaks the seal of privacy protected by the privilege and "there is no longer any reason for the privilege. The patient-litigant exception precludes one who has placed in issue his physical condition from invoking the privilege on the ground that disclosure of his condition would cause him humiliation. He cannot have his cake and eat it too." (*City & County of S. F.*

---

[8]"There is no privilege under this article as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by . . . the patient . . . ." (Evid. Code, § 996.)

[9]"THE COURT: . . . [T]his is very similar to the doctor-patient privilege, which is waived when an individual brings a lawsuit . . . for personal injuries and the doctor is called. . . .

"I don't think Mr. Kime can hide behind that privilege and still say that the property is community. I think there was a waiver."

v. *Superior Court, supra,* 37 Cal.2d at p. 232; accord *S. F. Unified Sch. Dist.* v. *Superior Court* (1961) 55 Cal.2d 451, 454-455 [11 Cal.Rptr. 373, 359 P.2d 925, 82 A.L.R.2d 1156]; *Moreno* v. *New Guadalupe Mining Co., supra,* 35 Cal.App. at p. 757 ["'[I]n actions for personal injury the permission to claim the privilege is a burlesque upon logic and justice.' (4 Wigmore, sec. 2389, p. 3359)]."] It has been expressly held that "[t]he patient-litigant exception applies only to the physician-patient privilege . . . and there is no corresponding client-litigant exception . . . ." (*City & County of S. F.* v. *Superior Court, supra,* 37 Cal.2d at p. 238; accord *S. F. Unified Sch. Dist.* v. *Superior Court, supra,* 55 Cal.2d at p. 455; *People* v. *Lines* (1975) 13 Cal.3d 500, 511-514 [119 Cal.Rptr. 225, 531 P.2d 793]; *Miller* v. *Superior Court* (1980) 111 Cal.App.3d 390, 393 [168 Cal.Rptr. 589] [psychotherapist-patient privilege under Evid. Code, § 1016].)

Although in the instant case there was no waiver of the privilege by consent pursuant to Evidence Code section 912, and the patient-litigant exception is inapplicable, we note that one California decision created a nonstatutory "fairness" implied waiver of the attorney-client privilege. In *Merritt* v. *Superior Court, supra,* 9 Cal.App.3d 721, the court held that plaintiff could not claim the attorney-client privilege to prevent discovery of communications by his former attorney during preparation of an underlying lawsuit because plaintiff in the current lawsuit had tendered the issue of the decisions, conclusions, and mental state of that attorney. Since plaintiff *had* to rely upon the lawyer's testimony in order to prove his case, the court held that defendant was entitled to inquire into communications related to the lawyer's state of mind. Subsequent cases, however, have distinguished *Merritt* as being limited in its application to the one situation in which a client has placed in issue the *decisions, conclusions, and mental state* of the attorney who will be called as a witness to prove such matters.[10] On the subject of waiver of the privilege, one writer has noted that "[a]lthough the appellate courts may narrow the scope of a statutorily created privilege through interpretation, no power is conferred upon the courts to destroy such a privilege under the guise of statutory interpretation." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 40.3, p. 1469.) In *Schlumberger, supra,* 115 Cal.App.3d at page 393, involving an attorney malpractice case, the court stated that "[i]f tendering the issue of damages in the malpractice action waived the privilege, there would be no privilege, and Evidence Code section 954 would be meaningless."

Despite the often cited principle that the attorney-client privilege tends to suppress otherwise relevant facts and is to be strictly construed, the privi-

[10]*Lohman* v. *Superior Court, supra,* 81 Cal.App.3d 90; *Miller* v. *Superior Court, supra,* 111 Cal.App.3d 390; *Schlumberger Ltd.* v. *Superior Court* (1981) 115 Cal.App.3d 386 [171 Cal.Rptr. 413].

lege is founded on important public policy. It would appear that to create a nonstatutory waiver in the instant case would "create an intolerable burden upon the . . . privilege, making it very difficult for the parties to the relationship to openly discuss matters which might eventually lead to litigation." (*Miller* v. *Superior Court, supra,* 111 Cal.App.3d at p. 395.)

### 4. *Was admission of Bergkvist's testimony harmless error?*

■ Having concluded that it was error to admit Bergkvist's testimony, we consider whether the error requires reversal in view of article VI, section 13 of the California Constitution which provides, in pertinent part, that "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground . . . of the improper admission . . . of evidence . . . unless, after an examination of the entire cause, including the evidence, the [reviewing] court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." A "miscarriage of justice" should be declared, and the judgment reversed, "only when the [reviewing] court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; Code Civ. Proc., § 475; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 318 at pp. 4297-4298, and authorities cited therein.)

In the case at bench it is "reasonably probable" (though far from certain) that, had the evidentiary error not occurred, the result would have been different. Bergkvist's improperly admitted testimony provided evidence damaging to Kime concerning central and crucial issues in the litigation. One such issue is whether the Stipulation was immediately binding upon the parties or merely a memorial of what the parties had agreed upon to that point. Another such issue is whether the property transfers on August 2, 1979, were made to transmute community property to separate property pursuant to the Stipulation. Bergkvist's testimony thus was damaging to Kime, provided facts not established by other evidence, and may well have been the factor that tipped the scales. Accordingly, we reverse the trial court's determination of entitlement and estate distribution.

PETITION FOR REVOCATION OF PROBATE OF
PURPORTED LOST WILL

■ The issue presented here by the Petition for Revocation is whether the document executed by Decedent qualifies as a will in view of its failure to recite explicitly dispositive provisions.

■ The controlling rule of will interpretation is stated in Probate Code section 101, which provides that a will is to be construed according to the intention of the testator. "'All other rules of construction are subordinate to this cardinal rule and in its application presumptions are to be indulged which will prevent entire or partial intestacy. (*Estate of Blake,* 157 Cal. 448, 458-459 [108 P. 287].)' (*Estate of Akeley,* 35 Cal.2d 26, 28-29 [215 P.2d 921, 17 A.L.R.2d 647].)" (*Estate of Karkeet* (1961) 56 Cal.2d 277, 281 [14 Cal.Rptr. 664, 363 P.2d 896]; see also *Estate of Strong* (1966) 244 Cal.App.2d 250, 256 [52 Cal.Rptr. 919] ["[W]ills should be interpreted with a view to preventing intestacies as to any portion of the estate."].)[11]

■ The intent of the testator is first determined by the language of the will itself. (Prob. Code, § 101; *Estate of Webb* (1977) 76 Cal.App.3d 169 [142 Cal.Rptr. 642]; *Estate of White* (1970) 9 Cal.App.3d 194 [87 Cal.Rptr. 881].) If the intent is not clear from the language of the will, extrinsic evidence is admitted. However, the stiff formalism of rules adopted by early English law restricted the admission of extrinsic evidence to aid in the interpretation of wills,[12] and the early California decisions perpetuated that formalism, even when interpreting statutory language containing no textual command to restrict the admission of extrinsic evidence.[13] Recent California decisions have reduced the inflexibility of these strict rules of interpretation[14] and arbitrary, irrational distinctions,[15] resulting in more liberal

---

[11]One decision has called section 101 the "'polar star of construction,'" to which all other rules must yield. (*Estate of Robinson* (1968) 262 Cal.App.2d 32, 36 [68 Cal.Rptr. 420].)

[12]While these formalistic rules resulted in greater certainty, they often produced results never contemplated by testators. These results were sometimes strongly defended: "It is better . . . that the intentions of twenty testators every week should fail of effect, than that the rules should be departed from upon which the security of titles, and the general enjoyment of property so essentially depend." (*Wing* v. *Angrave* (1860) 11 Eng.Rep. 397, 410, citing Fearne, Contingent Remainders, p. 173.)

[13]See generally Comment: *Ascertaining the Testator's Intent: Liberal Admission of Extrinsic Evidence* (1971) 22 Hastings L.J. 1349.

[14]Under the "plain meaning rule," for example, a word chosen by the testator with a common, general, and unambiguous meaning was determinative of the testator's intent, and the courts could not admit evidence of extrinsic circumstances to prove that a different meaning was intended by the testator. "[T]he expressed intent will not be varied under the guise of correction because the testator misapprehended its legal effect . . . . [I]t will be presumed that he designed that result." (*Estate of Young* (1899) 123 Cal. 337, 343-344 [55 P. 1011]; see also *Estate of Willson* (1915) 171 Cal. 449, 456 [153 P. 927].) In *Estate of Russell* (1968) 69 Cal.2d 200 [70 Cal.Rptr. 561, 444 P.2d 353] the California Supreme Court, noting the "current tendency to abandon the 'stiff formalism of earlier interpretation,'" held that "a court cannot determine whether the terms of the will are clear and definite in the first place until it considers the circumstances under which the will was made . . . ." (*id.* at p. 210), and hence abolished the arbitrary requirements of the plain meaning rule.

[15]For example, a latent ambiguity (appearing not upon the face of the will but when the terms are applied to the property and designated beneficiaries) could be resolved by extrinsic evidence, while a patent ambiguity (appearing on the face of the will) could not. (See *Taylor*

admissibility of extrinsic evidence to prove what the testator meant by the words he used.

 In the case at bench, we must interpret the Will in order to ascertain Decedent's intentions with respect to the property which is the subject of the Will. We observe that the Wolcott form contained no printed language explicitly dispositive; nor did it refer to beneficiaries or provide clear instruction or indication to a lay person as to where thereon to insert gifts. Some resulting confusion and ambiguity might be expected. As the Will contains no explicit dispositive provisions, we must determine whether by using the word "executrix" Decedent intended to will the property to Hyde. In doing so we do not rely on the demise of the plain meaning rule, as section 106 of the Probate Code provides a statutory qualification. Technical words are to be taken in their technical sense "unless it satisfactorily appears that the will was drawn solely by the testator, and that he was unacquainted with such technical sense." (Prob. Code, § 106.) Hence we must examine the Will "in the light of the circumstances surrounding its execution so as to ascertain what [Decedent] meant by the words used. Only then can it be determined whether the seemingly clear language . . . is . . . ambiguous." (*Estate of Russell, supra,* 69 Cal.2d at pp. 208-209; see also *Estate of Webb, supra,* 76 Cal.App.3d at p. 174.)

The Will form was filled in by Decedent without the assistance of an attorney, and the circumstances indicate that Decedent was unacquainted with the technical meaning of the word "executrix," which she misspelled by substituting an "s" for the "x." It was therefore proper to use extrinsic evidence to ascertain what Decedent meant by that word. If in the light of such extrinsic evidence the word "executris" [*sic*] is reasonably susceptible of more than one meaning claimed to have been intended by Decedent, "an uncertainty arises upon the face of [the] will" (Prob. Code, § 105). Hence extrinsic evidence relevant to prove any such reasonable meaning is admissible. *Estate of Russell, supra,* 69 Cal.2d at p. 212.)

 Finally, we must determine whether Decedent's *oral declarations* are admissible as extrinsic evidence to interpret the Will in light of section 105 of the Probate Code which provides: "When there is an imperfect description, or no person or property exactly answers the description, mistakes and omissions must be corrected, if the error appears from the context of the will or from extrinsic evidence, excluding the oral declarations of the testator as to his intentions; and when an uncertainty arises upon the face of a

---

v. *McCowen* (1908) 154 Cal. 798, 802 [99 P. 351]; 4 Page on Wills (Bowe-Parker rev. 1961) pp. 254-257.) The trend in recent decisions has been to do away with the distinction between patent and latent ambiguities and to admit extrinsic evidence to resolve all ambiguities. (See *Estate of Torregano* (1960) 54 Cal.2d 234 [5 Cal.Rptr. 137, 352 P.2d 505, 88 A.L.R.2d 597]; *Estate of Mohr* (1970) 7 Cal.App.3d 641 [86 Cal.Rptr. 731].)

will, as to the application of any of its provisions, the testator's intention is to be ascertained from the words of the will, taking into view the circumstances under which it was made, *excluding such oral declarations*." (Italics supplied.)

The rule embodied in section 105 excluding the testator's oral declarations is perhaps the last remnant of the old common law policy, now repudiated by the California Supreme Court, which excluded extrinsic evidence in most probate cases on the basis of the omnipotence of the written word.[16] With the demise of this outdated concept, our courts have understandably attempted to circumvent section 105 by creating exceptions and making subtle and often tenuous distinctions. For example, courts have allowed evidence of the testator's oral statements to show the "state of mind" of the testator,[17] to identify beneficiaries,[18] and to identify property.[19]

Similar to the case at bench is *Estate of Fries* (1963) 221 Cal.App.2d 725 [34 Cal.Rptr. 749]. The testatrix, using a printed form, appointed her husband as executor, but failed to name a beneficiary. The trial court permitted the husband to testify that the testatrix had orally promised to bequeath her property to him. But he was not allowed to give testimony as to her declarations tending to show that she believed the word "executor" meant one to receive the estate of the deceased spouse, i.e., "beneficiary." Reversing, the Court of Appeal held that the proscription of section 105 "does not apply

---

[16]*Estate of Russell, supra*, 69 Cal.2d 200. See also Comment: *Ascertaining the Testator's Intent: Liberal Admission of Extrinsic Evidence, supra*, 22 Hastings L.J. at page 1363; Comment: *Extrinsic Evidence and the Construction of Wills in California* (1962) 50 Cal.L.Rev. 283.

[17]*Estate of Mohr, supra*, 7 Cal.App.3d at page 647: "[T]he declarations of the testator as to his intentions are excluded. However, a person's state of mind with reference to the meaning of particular language used by him in a will is a circumstance surrounding the making of the will. And, the proscription of section 105 does not apply to the testator's oral declarations if they are offered to prove a state of mind [citations]." Accord *Estate of Gilliland* (1969) 276 Cal.App.2d 258 [80 Cal.Rptr. 876] (testator's oral declarations held admissible to prove a "state of mind" directly contradictory to the language of the will). See also *Estate of Flint* (1972) 25 Cal.App.3d 945 [102 Cal.Rptr. 345]: "The state of the feelings of the testatrix toward her daughter would be a relevant fact or circumstance attending the execution of the will which might be shown by extrinsic evidence, including oral declarations of the testatrix, not for the purpose of showing her testamentary intentions but to show the state of her feelings." (At p. 961.)

[18]In *Estate of Glow* (1962) 208 Cal.App.2d 613 [25 Cal.Rptr. 416] testatrix' holographic will left her estate to the "Broude Trust Fund," which did not formally exist. The court held that it was not error to admit into evidence testatrix' oral declarations referring to her brothers and sisters as the "Broude Trust." It is well settled that the declarations of a testator may be shown to make certain the identity of a beneficiary who is imperfectly or inexactly described or named in the will. [Citations.] . . . . Evidence to resolve ambiguity as to identity does not fall within the rule barring evidence of declarations within the meaning of section 105. [Citations.]" (At p. 617.)

[19]*Paley* v. *Superior Court* (1955) 137 Cal.App.2d 450 [290 P.2d 617].

to oral declarations of a testator which are offered for the purpose of showing his state of mind with respect to the meaning of particular language used by him in a will which is ambiguous." (*Id.* at p. 730.)[20]

We also note that Decedent's "state of mind" may have been such that she reasonably believed the printed word "appoint" in the Wolcott form to be an adequate expression of an intent to designate a beneficiary. Such a common understanding of the word is apparent from its definition, e.g., in Random House College Dictionary (1982 ed.) at page 66: "appoint . . . 3. *Law.* to designate (a person) to take the benefit of an estate created by a deed or will." Accordingly, as used here "appoint" is not free from ambiguity and may be interpreted as a term of disposition.

We conclude, in the case *sub judice*, that notwithstanding the prohibition of section 105 there is precedent for the trial court's admission into evidence of Decedent's oral statements concerning the disposition of the property mentioned in the Will, and we affirm as to the denial of the Petition for Revocation. The statements are admissible to indicate Decedent's "state of mind with respect to the meaning of particular language used by [her] in a will which is ambiguous." (*Estate of Fries, supra,* 221 Cal.App.2d at p. 730.) They are also admissible to identify the beneficiary of the Will. (*Estate of Glow, supra,* 208 Cal.App.2d 613; *Estate of White, supra,* 9 Cal.App.3d 194.)

We recognize and regret, however, that the foregoing interpretation perpetuates the recent tendency of our courts to make subtle and often questionable distinctions[21] in order to circumvent the statutory prohibition of section 105 in attempting to produce just results by giving effect to the paramount rule in the interpretation of wills: a will is to be construed according to the intention of the testator, and not his imperfect attempt to express it. One court has commented as follows on the current state of the law relating to section 105:

---

[20]After receiving all of the evidence at the hearing following remand and in view of conflicting testimony, the trial court ordered that the estate be distributed according to the law of intestate succession. The trial court's interpretation of the will on the remand was upheld on a subseqent appeal. (*Estate of Fries* (1965) 238 Cal.App.2d 558 [47 Cal.Rptr. 888].)

[21]One commentator has stated: "To summarize, oral declarations of intent, if made to the scrivener, are generally admissible to resolve a latent ambiguity. They are probably inadmissible to resolve a patent ambiguity. However, it is almost impossible to know whether the courts will label certain ambiguities as latent or patent. Moreover, there are cases that have admitted the evidence where the ambiguity was 'on the face of the will,' and there are cases where declarations of intent were admitted though not made to the scrivener. Thus, the courts are in the position of being able to admit or reject the evidence while relying on a 'rule' and ample precedent. It is almost impossible, therefore, to predict when the evidence will be excluded and when it will be admitted." (Comment, *Extrinsic Evidence and the Construction of Will in California, supra,* 50 Cal.L.Rev. 295-296.)

"While it has been suggested that the rationale for the rule [of Prob. Code, § 105] has outlived its utility, and that the only criteria for the admission of any extrinsic evidence as an aid in interpretation of ambiguous documents should be its relevancy and weight (Comment: *Extrinsic Evidence and the Construction of Wills in California,* 50 Cal.L.Rev. 283, 298), the rule still exists. (See *Estate of Russell, supra,* 69 Cal.2d 200, 212.)

". . . . . . . . . . . . . . . . . . . . . . . . .

"A scholarly analysis of the cases interpreting section 105 . . . has resulted in the justifiable conclusion that it is impossible to determine when the testator's oral declarations would be deemed admissible in any given case (Comment: *Extrinsic Evidence and the Construction of Wills in California,* 50 Cal.L.Rev. 283, 292-296) because the courts, in an understandable effort to circumvent the harshness of the rule have attempted to create multiple exceptions or, oftentimes, simply ignored its existence." (*Estate of White, supra,* 9 Cal.App.3d at p. 201.)[22]

"Our duty does not end with disposition of the case at bench. We have an obligation to call to the attention of the Legislature the existence of any large block of cases reaching the courts which statutory change could avoid . . . ." (*Meritplan Ins. Co.* v. *Woollum* (1975) 52 Cal.App.3d 167, 176 [123 Cal.Rptr. 613].) The case at bench is one of many which have struggled with the "conundrum as to when extrinsic evidence is permitted to assist in the construction of a will . . . ." (*Estate of Webb, supra,* 76 Cal.App.3d at p. 175.)

We commend the matter at issue to the Legislature of this state. Statutory revision allowing admission of all relevant evidence, including the testator's oral declarations, is the only certain method to clarify the implementation of that policy which modern authorities widely consider to be the desired result—to give effect to the intention of the testator.

The judgment is affirmed as to the petition for revocation of probate of purported lost will and reversed as to the petition for determination of entitlement to estate distribution.

Thompson, J., and Johnson, J., concurred.

---

[22]In *White,* the testatrix' holographic will made a specific disposition, to named persons, of all but three items of property. The court held that the testatrix' oral declarations were properly admitted to resolve an ambiguity as to the identity of the beneficiary.

## APPENDIX A

### LAST WILL AND TESTAMENT

S0P29579

I, _Concha Cristina Kime_, a resident of _3135 Bellflick Blvd, Long Beach_, California, declare this to be my last Will and revoke all other Wills previously made by me:

**FIRST:**

My home (residence) and all effects therein & automobile, 1973 Caprice auto license 927-HHF.

ADMITTED TO PROBATE
Date JAN 2 1 1980
Att: _____ ___y Clerk
By _David J. Allard_ Deputy

FILED DEC 2 9 1979 _____ 19___
BY _____ COUNTY CLERK
_____ DEPUTY
BK 2300 PG 740

_____: I appoint _Betty J. Hyde_

as Executrix of this Will _& Last Testament_

This Will was signed by me on the _18 Aug_ day of ____, 19 _75_ at _5105 E Carson, Lakewood_, California.

_Concha Cristina Kime_

THE FOREGOING INSTRUMENT was, on the date thereof, signed by the testatrix _Concha Cristina Kime_, in our presence, we being present at the same time, and She then declared to us that the said instrument was her last Will; and we, at the request of said _Testator_, and in her presence, and in the presence of each other, have signed the same as witnesses. We further declare that at the time of signing this will the said _Testatrix_ appeared to be of sound and disposing mind and memory and not acting under duress, menace, fraud or the undue influence of any person whomsoever.

_Kay Marie Clegg_ .......... residing at _5105 E Carson, Lakewood Ca_
Signature of Witness

_____ .......... residing at _5105 E Carson, Lakewood Ca_
Signature of Witness

_Patricia A Green_ .......... residing at _5105 E Carson, Lakewood Ca_
Signature of Witness

P. 12