SKY VALLEY LIMITED PARTNERSHIP, an Illinois limited partnership, and Tang Industries, Inc., an Illinois Corporation, Plaintiffs,

v.

ATX SKY VALLEY, LTD., a Texas limited partnership; ATX, Inc., a Texas corporation; Ronald J. Volkman, an individual; Lawrence M. Whittington, an individual; and John Airhart, an individual, Defendants.

No. C–91–2616 FMS (WDB).

United States District Court,
N.D. California.

Aug. 30, 1993.

Timothy R. Pestotnik and Robert G. Steiner of Luce, Forward, Hamilton & Scripps, San Diego, for plaintiffs.

Ronald L. Holmes and Jay R. Kline, Jr. of Holmes, Millard & Duncan, Dallas, TX, and Merrill G. Emerick and Douglas G. Chapman III of Anderlini, Guheen, Finkelstein & Emerick, San Mateo, for defendants.

## ORDER RE DISCOVERY

BRAZIL, United States Magistrate Judge.

### INTRODUCTION

Defendants ATX Sky Valley, Ltd., ATX, Inc., Ronald Volkman and John Airhart (hereafter collectively referred to simply as ATX) have moved the court for an order compelling plaintiffs and counter-defendants Sky Valley Limited Partnership, Tang Industries, Inc., as well as counter-defendants Cyrus Tang, Dan Chambers, and CT Nine, Inc. (hereafter collectively referred to simply as Sky Valley) to produce the documents and to answer the other discovery questions which relate to the period between October 11, 1989 and June 17, 1991 and which Sky Valley has refused to produce or answer on the basis of the attorney-client privilege.[1]

The documents and other matter as to which plaintiffs invoke the attorney-client privilege consist of or reflect, according to plaintiffs, communications made in confidence between plaintiffs and lawyers at the firm of Luce, Forward, Hamilton & Scripps (hereafter referred to as Luce Forward). Plaintiffs further assert that these communications were made as part of the process in which they sought and received legal advice. Moreover, they are communications to which defendants were not privy (if defendants had been privy to these communications there would be no need to press this motion to compel). It thus is clear that plaintiffs have made a prima facie showing that the communications in issue are protected by the attorney-client privilege.

Defendants base their motion, however, on the theory that, during the relevant period, they too were clients of Luce Forward, at least with respect to matters having to do with the Sky Valley development project (hereafter referred to as the project). More specifically, defendants assert that they and plaintiffs were "joint clients" of Luce Forward between October 11, 1989 and June 17, 1991 and that they are entitled under section 962 of the California Evidence Code[2] to full access to all project-related communications between plaintiffs and Luce Forward during that period. For the reasons set forth below, we hold that defendants have not proved that they were clients or joint clients of Luce Forward at any time. We therefore DENY defendants' motion.

---

1. Plaintiffs have claimed that the work product doctrine also protects some of the documents that are the subject of this motion. Because we uphold plaintiffs' position on attorney-client privilege, we need not reach the work product issues.

2. The parties agree that California law governs disposition of this privilege issue. Because this case is in federal court on the basis of diversity jurisdiction, Federal Rule of Evidence 501 directs us to apply state law to resolve privilege disputes.

Section 962 of the California Evidence Code reads:

Where two or more clients have retained or consulted a lawyer upon a matter of common interest, none of them, nor the successor in interest of any of them, may claim a privilege under this article as to a communication made in the course of that relationship when such communication is offered in a civil proceeding between one of such clients (or his successor in interest) and another of such clients (or his successor in interest).

## THE RELEVANT LAW

We note at the outset that the issue we address is *not* whether communications between ATX and Sky Valley, or between ATX and Luce Forward, are protected by the privilege *as against third parties* (i.e., as against the rest of the world). The issue, rather, is whether ATX can discover the content of communications made in private between Luce Forward and its client, Sky Valley. Different considerations would inform analysis of issues about confidentiality as to the rest of the world than inform analysis about confidentiality as between Sky Valley and ATX.

In a setting like this, a party cannot successfully invoke the protections of section 962 of the Evidence Code unless that party first establishes that it was indeed a "client" of the lawyer or law firm.

It also is important to emphasize that the mode of analysis or the criteria for determining whether a party qualifies as a "client", or has established that an "attorney-client relationship" existed between itself and a particular lawyer or law firm, may be different in different settings. We cannot merely transport into the setting we confront in this case, for example, the simpler mode of analysis California courts use when determining whether a person qualifies as a "client" for the purpose of resolving a dispute about whether a communication from an individual who first interviews a lawyer in order to decide whether to hire her is protected by the attorney client privilege. In the latter setting, the courts have given expansive (generous) constructions to Evidence Code section 951 (which is the source of the formal definition of the term "client")[3] because the courts have felt that such constructions are necessary to promote society's interests in encouraging people to seek legal advice and in protecting the process by which people determine whether they need a lawyer and which lawyer would be best for them. Cf. *People v. Canfield,* 12 Cal.3d 699, 705, 117 Cal.Rptr. 81, 527 P.2d 633 (1974); *Benge v. Superior Court,* 131 Cal.App.3d 336, 345, 182 Cal.Rptr. 275 (5th Dist.1982).

In contrast, California courts have felt constrained to use more complicated analyses, informed by different considerations and competing interests, when their task has been to decide whether a party has established the "joint client" *exception* to the attorney-client privilege. See, e.g., *McCain v. Phoenix Resources, Inc.,* 185 Cal.App.3d 575, 230 Cal.Rptr. 25 (1st Dist.1986). In the latter setting, the courts have not been satisfied simply to ask whether each of two persons sought legal service or advice from a particular lawyer in her professional capacity. Instead, the courts have focused on whether it would have been *reasonable,* taking into account *all the relevant circumstances,* for the person who attempted to invoke the joint client exception to have inferred that she was in fact a "client" of the lawyer. Cf. *Responsible Citizens v. Superior Court of Fresno County,* 16 Cal.App.4th 1717, 1733, 20 Cal. Rptr.2d 756 (5th Dist.1993); *Fox v. Pollack,* 181 Cal.App.3d 954, 959, 226 Cal.Rptr. 532 (1st Dist.1986); for federal authorities on this issue, see Paul R. Rice, *Attorney–Client Privilege in the United States* (Lawyers Cooperative Publishing 1993), esp. at 229–234.

It is appropriate to focus on what a party in the given circumstances would *reasonably* have inferred because in legal theory the attorney-client relationship can be formed, at least for purposes of determining whether a party was, over time, a joint client of the same lawyer with another party, *only by contract,* express or implied.[4] *Responsible Citizens,* 16 Cal.App. 4th at 1732, 20 Cal.Rptr.2d 756. In most cases where there is a dispute about whether an attorney-client

---

**3.** Section 951 of the California Evidence Code reads:

As used in this article, "client" means a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity, and includes an incompetent (a) who himself so consults the lawyer or (b) whose guardian or conservator so consults the lawyer in behalf of the incompetent.

**4.** "Except for those situations where an attorney is appointed by the court, the attorney-client relationship is created by some form of contract, express or implied, formal or informal." *Fox,* 181 Cal.App.3d at 959.

relationship was formed there will be no express contract, so resolution of the dispute will turn on whether a contractual relationship was formed implicitly. To answer that question, courts necessarily look to circumstantial evidence, taking into account all kinds of indirect evidence and contextual considerations that appear relevant to determining whether it would have been reasonable for the person to have inferred that she was the client of the lawyer. Thus, in this setting, whether the attorney-client relationship existed is a question of law that is resolved through an objective test. Cf. *Responsible Citizens*, 16 Cal.App.4th at 1733, 20 Cal. Rptr.2d 756. While the subjective views of both the party and the lawyer may be relevant, they are not dispositive. In fact, subjective views that are deemed clearly unreasonable, after consideration of all the pertinent circumstances, become, as a matter of law, irrelevant. See *Fox*, 181 Cal.App.3d at 959, 226 Cal.Rptr. 532;[5] see also, generally, Rice, *Attorney–Client Privilege in the United States, supra*, at 230–231.

■ There are a great many factors that the courts should take into account when deciding whether an implied contractual relationship exists for purposes of the joint client exception. These pertinent circumstances generally will include: the conduct of the party and counsel, what the party and counsel communicated to one another (both about their relationship and about other things, taking special note of any communications from the party to counsel that courts would not expect the party to have made if it had not considered itself to be a joint client of the lawyer), what drove the party to communicate with the lawyer and the lawyer to communicate with the party (considering especially whether the party was obligated to communicate what it did to the lawyer or was free to decide whether or not to make the communications to the lawyer), the capacity in which the party communicated with the lawyer and the capacity in which the lawyer communicated with the party, whether (with respect to matters on which the party and the lawyer communicated) the party played a decision-making role comparable to the role that the law empowers clients to play, whether the party was free to ignore the lawyer's advice or was bound to act in conformity with directives from the lawyer, whether the party paid or was obligated to pay the lawyer for her services, the relative sophistication of the party and the magnitude or significance of the interests of the party that were implicated in the matters covered by the alleged attorney-client relationship (the more sophisticated the party, and the more significant the interests affected, the more skeptically courts should view arguments that it was reasonable to rely on an *implied* attorney-client contract), and whether and to what extent the party also consulted or had access to any other lawyers during the relevant time period and with respect to the subject matter as to which that party is seeking to invoke the joint client exception.

■ Moreover, since the ultimate question is whether the law will deem *two* (or more) parties to have been "joint clients" of a particular lawyer, it also is necessary (in conducting this inquiry into all the relevant circumstances) to analyze all pertinent aspects of the relationship and dynamics between (a) the party that claims to have been a joint client and (b) the party that clearly was a client of the lawyer in question. This analysis should include (but not necessarily be limited to) (1) the conduct of the two parties toward one another, (2) the terms of any contractual relationship (express or implied) that the two parties may have had, (3) any fiduciary or other special obligations that existed between them, (4) the communications between the two parties (directly or indirectly), (5) whether, to what extent, and with respect to which matters there was separate, private communication between either of them and the lawyer as to whom a "joint" relationship allegedly existed, (6) if there was any such separate, private commu-

5. "Appellants did allege that they 'thought' respondent was representing their interests because he was an attorney. However, they allege no evidentiary facts from which such a conclusion could reasonably be drawn. Their states of mind, unless reasonably induced by representations or conduct of respondent, are not sufficient to create the attorney-client relationship; they cannot establish it unilaterally." *Fox*, 181 Cal. App.3d at 959, 226 Cal.Rptr. 532.

nication between either party and the alleged joint counsel, whether the other party knew about it, and, if so, whether that party objected or sought to learn the content of the private communication, (7) the nature and legitimacy of each party's expectations about its ability to access communications between the other party and the allegedly joint counsel, (8) whether, to what extent, and with respect to which matters either or both of the alleged joint clients communicated privately with *other* lawyers, (9) the extent and character of any interests the two alleged joint parties may have had in common, and the relationship between common interests and communications with the alleged joint counsel, (10) actual and potential conflicts of interest between the two parties, especially as they might relate to matters with respect to which there appeared to be some commonality of interest between the parties, and (11) if disputes arose with third parties that related to matters the two parties had in common, whether the alleged joint counsel represented both parties with respect to those disputes or whether the two parties were separately represented.

▮ While analyzing factors such as these, and before deciding the ultimate issue, courts should take fully into account the ultimate policy rationales for the attorney-client privilege, the joint client privilege, and the joint client exception to the privilege, specifically considering the implications of each possible resolution of the issue for those policy rationales. For each possible resolution we must ask: would this holding cause harm to or would it promote the underlying purposes that inform privilege doctrine? Which of the different possible dispositions of this matter would contribute most to promoting the objectives of that doctrine? Which would do most harm to those objectives?

▮ To think reliably about these questions, it is important to understand what those objectives are. California courts have repeatedly emphasized that the primary purpose of the attorney-client privilege is to encourage the freest and, therefore, the full-

est possible communication between clients and their attorneys, hoping that such fulsomeness of communication will maximize the likelihood that the legal advice given will be reliable and that persons generally will understand their legal obligations and honor them. See, e.g., *Estate of Kime v. Barnard,* 144 Cal.App.3d 246, 254–55, 193 Cal.Rptr. 718 (2d Dist.1983). The principal purpose of the joint client privilege is, similarly, to encourage the fullest possible communication between joint clients—and between them and their joint lawyer—with respect to matters related to the joint representation. See Rice, *Attorney–Client Privilege in the United States, supra,* at 228; *Eureka Investment Corp. v. Chicago Title Ins. Co.,* 743 F.2d 932, 937 (D.C.Cir.1984). The principal purposes of the joint client *exception* to the privilege, on the other hand, are (1) to prevent unjustifiable inequality in access to information necessary to resolve fairly disputes that arise between parties who were in the past joint clients—when the disputes relate to matters that were involved in the joint representation and (2) to discourage abuses of fiduciary obligations and to encourage parties to honor any legal duties they had to share information related to common interests. In California precedents, these fairness objectives are most clearly visible in cases that have pitted insureds against their former carriers, see, e.g., *Glacier General Assurance Co. v. Superior Court,* 95 Cal.App.3d 836, 157 Cal.Rptr. 435 (2d Dist.1979), and former partners against one another, see *Wortham & Van Liew v. Superior Court,* 188 Cal.App.3d 927, 233 Cal.Rptr. 725 (4th Dist.1987); *McCain v. Phoenix Resources, Inc.,* 185 Cal.App.3d 575, 230 Cal.Rptr. 25 (1st Dist.1986); see also *Roberts v. Heim,* 123 F.R.D. 614 (N.D.Cal. 1988).

### APPLICATION OF THE LAW
### TO THE CASE AT BAR

▮ We begin by acknowledging that the parties dispute some factual matters that they perceive to be relevant to resolution of this motion.[6] Counsel have submitted hun-

---

6. We have received competing declarations which contain mutually exclusive versions of some facts. We have held no evidentiary hearing

because we have concluded that our ruling on this motion would not change regardless of which version we might accept of the facts that

dreds of pages of documents and scores of pages of declarations in support of their clients' respective positions. In the court's view, however, there are no genuinely disputable matters of fact on whose resolution the disposition of this motion depends. Stated differently, the court has based its decision only on factual matters that are not reasonably subject to dispute.

We also acknowledge at the outset that Sky Valley and ATX had considerable interests in common with respect to the project and that there was a great deal of communication between ATX and Luce Forward that was presumptively confidential [7] and that was made for the purpose of securing legal advice on matters related to the project. While at first blush these important facts might seem to dictate the outcome of this dispute, we have concluded, as indicated above, that this matter can be resolved only by working through an analysis that includes consideration of many additional factors. We turn now to that task.

ATX officers claim, through declarations,[8] that they subjectively believed, during the relevant period, that ATX enjoyed an attorney-client relationship with Luce Forward, jointly with Sky Valley. Given the many circumstances we point to, below, that support the inference that a reasonable person in these circumstances could not have harbored any such belief, and given the extreme tardiness by defendants in raising this issue at all,[9] these declarations strain our credulity. To resolve the issue before us, however, we need not determine whether these declarations are truthful. For purposes of our ruling, we will assume (without deciding) that at least some high level players in the ATX operation subjectively believed that ATX was a client of Luce Forward during the relevant period. For reasons set forth in detail below, we hold that any such subjectively held views were clearly unreasonable.

The subjective views of the lawyers at Luce Forward who performed services related to the project flatly contradict the subjective views of ATX. In their declarations, each one of the lawyers at Luce Forward who worked on the project insists that his or her client was Sky Valley and that he or she never considered ATX a client at any time for any purpose.[10] Each Luce Forward law-

are disputed in the declarations. We are cognizant of the fact that under California precedents the "question of whether an attorney-client relationship exists is one of law," but that "when the evidence is conflicting, the factual basis for the determination must be determined before the legal question is addressed." *Responsible Citizens*, 16 Cal.App.4th at 1733, 20 Cal.Rptr.2d 756 (citations omitted).

7. The presumptive confidentiality did not apply to Sky Valley, but to the rest of the world. See Article VIII of the "Property Development and Management Agreement," executed on September 7, 1989, by representatives of ATX and of Sky Valley, exhibit 1 to the Declaration of John Airhart, filed May 17, 1993 (cited hereafter as Development Agreement).

8. See, e.g., Declaration of John Airhart, filed May 17, 1993, ¶ 20; Second Supplemental Declaration of John Airhart, filed July 21, 1993, ¶ 13; and Declaration of William H. Rogers, III, filed June 23, 1993, ¶ 5.

9. If ATX really had believed that Luce Forward was jointly its lawyer it seems to us extremely likely that, promptly after the filing of the complaint in this action, ATX would have interposed a vigorous objection to Luce Forward representing Sky Valley here. The court finds quite unpersuasive the purported reasons that ATX has offered to try to justify its failure to raise an objection many months ago, or to insist much earlier in this litigation on the disclosures it pursues through this motion. It is clear that many months ago, in fact even before this action was filed, ATX had access to and possession of the vast majority of the underlying documents that it initially submitted in support of this motion. Given what those documents contain, and ATX's extensive reliance on them, the alleged lack of knowledge of some of the actions of some senior ATX officers hardly justifies the contention that it wasn't until substantial discovery had been completed in this case that ATX could assert with the requisite level of confidence that *it subjectively believed during the relevant period that it was Luce Forward's client*. Given the principal structural bases for ATX's argument that it was Luce Forward's client, i.e., the extensive, foreseeably necessary, and obvious communications between ATX and Luce Forward about legal matters during the relevant period, there is severe tension between the assertion, here made, that ATX in fact believed, during the relevant period, that it was a client of Luce Forward, and ATX's extreme tardiness in raising the point in this lawsuit.

10. See, e.g., Declaration of Robert D. Buell, filed June 16, 1993; Declaration of Timothy R. Pestotnik, filed June 16, 1993; Declaration of Heidi

yer also insists, without contradiction, that he or she never communicated to anyone, including anyone associated with any ATX entity, that ATX was a Luce Forward client. At least one Luce Forward lawyer specifically recalls stating affirmatively, in the presence of third parties and a representative of ATX, that Luce Forward represented Sky Valley and *not* ATX. See Third Declaration of Ronald W. Rouse, filed July 21, 1993, paragraphs 9–10. While ATX has attempted to undermine this factual assertion, that effort is too oblique and inconclusive to be persuasive.[11] The undisputed facts that Luce Forward never billed ATX for anything, that ATX never paid Luce Forward for anything,[12] and that there never was an express contract, written or oral, between Luce Forward and ATX for the provision of any legal services, lends credibility to the assertions by the Luce Forward lawyers that they never considered ATX a client. The absence of any kind of express contract between ATX and Luce Forward takes on added significance in light of the alleged magnitude of ATX's economic interest in the project and ATX's sophistication in the business world generally. We question whether a commercially sophisticated party that alleg-

edly has a multi-million dollar interest in a project would form an attorney-client relationship without a shred of paper memorializing even the most basic terms of that alleged relationship.

We turn next to the communications between Luce Forward and ATX. We note at the outset that ATX does not assert that anyone on its behalf ever communicated to anyone at Luce Forward or at Sky Valley that ATX believed that it was a client of Luce Forward for any purpose or at any time. Nor does ATX assert that any Luce Forward lawyer ever communicated to anyone at ATX that Luce Forward considered ATX to be its client, for any purpose or at any time. Further, ATX appears to concede that it received copies of letters sent by Luce Forward to third parties in which Luce Forward explicitly identified its client as Sky Valley and did not even intimate that ATX might also be its client.[13] ATX also concedes that when the project gave rise to litigation in which both ATX and Sky Valley were named as defendants, Luce Forward represented only Sky Valley, insisting that, because of potential conflicts of interest, ATX arrange for separate representation.[14] In

Skuba Maretz, filed June 16, 1993; Declaration of Ronald W. Rouse, filed June 16, 1993; Declaration of David M. Hymer, filed June 16, 1993; Declaration of Thomas A. May, filed June 16, 1993; Declaration of E. Blake Moore, Jr., filed June 16, 1993; Declaration of Jeffrey A. Chine, filed June 16, 1993; Third Declaration of Ronald W. Rouse, filed July 21, 1993; Second Declaration of Timothy R. Pestotnik, filed July 21, 1993; Second Declaration of Thomas A. May, filed July 21, 1993; Second Declaration of David M. Hymer, filed July 21, 1993; Second Declaration of Jeffrey A. Chine, filed July 21, 1993; and Second Declaration of Robert D. Buell, filed July 21, 1993.

11. Attempting to contradict Mr. Rouse's assertion, ATX has submitted a Supplement Declaration of John Airhart, filed June 24, 1993. Mr. Airhart swears that Mr. Rouse never made such a statement in Mr. Airhart's presence. Mr. Rouse, however, does not assert that Mr. Airhart was present when Mr. Rouse made the alleged statement. Moreover, Mr. Airhart is able to claim only that he attended most of the kinds of meetings to which Mr. Rouse adverts. Thus Airhart must admit that Mr. Rouse could have made the alleged statement at a meeting Mr. Airhart did not attend. Nor is there any other declaration submitted on behalf of ATX which, if true,

would foreclose the possibility that Mr. Rouse made the statement he swears he made.

12. ATX argues that it indirectly paid a portion of Luce Forward's legal fees because Luce Forward's bills were paid out of project overhead monies [all of which were provided directly by Sky Valley] and because ATX was entitled under the Development Agreement to a percentage of net profits from the project (after Sky Valley recouped its investment and received the first 25% of the profits from the undertaking). As Luce Forward points out, this strained argument would make every employee of a company with any kind of profit sharing plan a "client" of the lawyer for the company. Clearly that is not the law. Such indirect adverse impact on such contingent future benefits simply cannot be considered "payment" of legal fees as that concept has been developed by California courts in related analytical settings.

13. See Declaration of Robert D. Buell, filed June 16, 1993, ¶¶ 10–17, and exhibits 1–5 attached thereto.

14. See Declaration of Timothy R. Pestotnik, filed June 16, 1993, ¶¶ 12–15 and exhibits 5–7 attached thereto; Declaration of Robert D. Buell,

fact, ATX was represented in such litigation by a separate law firm (O'Donnell & Pia).

There is, however, one significant aspect of the communications between Luce Forward and ATX that does lend support to an inference that ATX reasonably believed it was a client of Luce Forward. The documents show that there was considerable communication from ATX to Luce Forward seeking legal advice related to the project and considerable communication from Luce Forward to ATX containing legal advice about the project and about steps ATX should take to satisfy the legal requirements necessary to move the project forward. In short, it is clear that legal advice was sought and given. These facts, while clearly relevant, are equally clearly not sufficient to establish that ATX was a client of Luce Forward for purposes of the joint client exception to the attorney-client privilege. To explore the significance of these facts *for purposes of the joint client exception* [15] we must consider why the communications were made and the capacities in which ATX and Luce Forward were functioning at the time they made the communications.

ATX sought the legal advice it sought from Luce Forward, and Luce Forward gave the advice it gave to ATX, not as a result of voluntarily made decisions to form a new professional relationship, but as a result of independent contractual obligations that ATX and Luce Forward separately had to Sky Valley. ATX, through an elaborate written contract, was the project manager for Sky Valley. See Development Agreement, *supra* note 7. In its capacity as project manager, ATX was contractually obligated to seek the assistance of Luce Forward in meeting the many legal needs of this large project. See, in combination, Section 4.02 of the Development Agreement and letter of October 11, 1989, from D.L. Chambers of Tang Industries, Inc., to John Airhart of ATX, exhibit 2 to the Declaration of John Airhart, filed May 17, 1993 (we refer to this letter hereafter as the "election letter" because it announces formally Sky Valley's election to have Luce Forward provide the legal services for the project).

Through an entirely separate contractual relationship with Sky Valley, Luce Forward was the project lawyer for Sky Valley and, in that capacity, was obligated to meet the project's legal needs as identified by ATX. Thus when it sought assistance from Luce Forward, ATX was acting in its capacity as project developer and manager, and only in that capacity. ATX has presented no evidence that it ever claimed any right of its own to legal advice from Luce Forward, any right independent of its duties as project developer and manager under its contract to Sky Valley. Nor has ATX proffered evidence that it ever sought from Luce Forward legal advice for any needs it might have had that were either independent of project needs or arguably in tension with Sky Valley's interests. When ATX sought assistance from Luce Forward, in other words, it was not for ATX's own legal needs, but only for the needs of the project, the project that Sky Valley owned.

The fact that ATX and Luce Forward communicated with one another *only in these capacities* makes it less likely that ATX could reasonably infer that it was a client of Luce Forward. ATX knew that Luce Forward was Sky Valley's lawyer. ATX knew that ATX had a contractual duty to communicate with Luce Forward and to follow instructions about legal matters from Luce

filed June 16, 1993, ¶¶ 18 and 19; and Declaration of William H. Rogers, III, filed June 23, 1993, ¶¶ 9–10.

**15.** The nature of our analysis would be different if the issue before us were: are these communications privileged as against the rest of the world? Similarly, we would apply different criteria if we were considering whether the privilege should attach to communications made by a party and a lawyer for the purpose of determining whether a party needed a lawyer or who the party should select as its counsel. In those situations, the issue is: does the privilege attach in the first place? In the situation in the case at bar, by contrast, we know that the privilege attaches to the communications that defendant is trying to discover: communications made in private between Luce Forward and its client, Sky Valley. The issue in the case at bar is: has defendant proved that it is entitled to use the joint client exception to penetrate the protection that the privilege presumptively creates in favor of Sky Valley?

Forward. See Deposition of ATX Vice President William H. Rogers, August 14, 1992, pp. 457–58, wherein Rogers testifies that he felt he was required to follow Luce Forward's legal advice.[16] ATX has not contended that it shared power with Sky Valley to direct, or to re-direct, Luce Forward's work. Nor has ATX contended that it shared power with Sky Valley to decide how to respond to Luce Forward's advice, whether to accept or reject it. Nor could ATX contend that it was acting in any sense as an equal with Sky Valley on this project; the Development Agreement clearly located all significant final power in Sky Valley. See, again, Section 4.02 of that Agreement. Thus, in seeking and in responding to legal advice from Luce Forward, ATX was acting neither voluntarily nor independently. In short, ATX was not acting, vis-a-vis Luce Forward, in ways the law generally associates with "clients".

Even though the terms of the Development Agreement categorized ATX as an "independent contractor," [17] at least for some purposes, the role ATX played vis-a-vis Luce Forward seems to us much closer to the role of client (Sky Valley) "representative", as that term is used in section 951 of the California Evidence Code and explained in cases interpreting section 952. Under the Development Agreement and the "election letter," ATX was authorized and directed by Sky Valley, the owner of the project, to communicate regularly and in confidence with Luce Forward in order to equip Luce Forward, informationally, to provide the legal services necessary to move the project toward completion. Given ATX's comprehensive, front line responsibilities for development and management, and Sky Valley's remoteness from the day-to-day operation, it was necessary for ATX to be in regular communication with Luce Forward if Sky Valley's needs for legal services related to the project were to be met. In this sense, ATX played a role similar to that played in some settings by accountants who are retained to generate

information about a party that the party is not equipped to generate itself and that a lawyer needs in order to provide reliably informed legal advice to the party. See, e.g., *Sheets v. Superior Court,* 257 Cal.App.2d 1, 9–10, 64 Cal.Rptr. 753 (2d Dist.1967); 2 Jefferson, *Cal. Evid. Benchbook,* Lawyer–Client Privilege, § 40.1, at 1425–26 (1982 and supplemented in 1990 without change to this section).

The fact that ATX used counsel other than Luce Forward when litigation arose in connection with the project,[18] and the fact that ATX had access to and in fact consulted yet another lawyer[19] *about project matters* throughout the period of ATX's affiliation with the undertaking, are additional considerations that tend to undermine the argument that a party in ATX's position would reasonably have inferred that it was Luce Forward's client. Had ATX been Luce Forward's client for purposes related to the project, ATX would have had no need or occasion to consult with and to pay another lawyer for legal services related to the project. Yet ATX indisputably had attorney-client relationships with lawyers outside Luce Forward with respect to project matters. The undisputed existence of those separate attorney-client relationships undercuts the contention that ATX also was Luce Forward's client. It also is noteworthy that no one has suggested that Sky Valley or Luce Forward sought to penetrate the protections that presumptively attached to the confidential communications between ATX and either of its project-related counsel (Holmes or O'Donnell).

ATX contends that its officers communicated many sensitive, confidential matters to Luce Forward that those officers never would have communicated if they had known that ATX was not Luce Forward's client. Having reviewed the pertinent declarations and documents, however, we have concluded that ATX had an affirmative contractual duty

---

16. See also Declaration of William H. Rogers, III, filed June 23, 1993, ¶ 12.

17. See § 4.03 of that Agreement.

18. Jonathan O'Donnell of O'Donnell & Pia.

19. Ronald L. Holmes, who, for a considerable earlier period, had actively represented ATX's obviously separate interests in the negotiations leading to the sale of the land to Sky Valley and the execution of the Development Agreement.

to Sky Valley to disclose all the matters allegedly covered in these communications. While some of the matters that ATX officers allegedly communicated in private to Luce Forward lawyers were indeed sensitive, and while many of these communications would be protected by privilege doctrine from disclosure to third parties, ATX had no right to keep these matters secret from Sky Valley or its counsel, Luce Forward.

Under the Development Agreement, ATX obligated itself to (1) "act as a fiduciary with respect to any assets of Owner under Development Manager's supervision, management, control or direction," (§ 3.01), (2) "advise Owner as to the propriety of payment of all accounts of the consultants," (§ 3.02(c)), (3) "advise the Owner as to the propriety of payment of all accounts of the Construction Contractor," (§ 3.02(x)), (4) "promptly notify Owner of any anticipated delay in construction ..." (§ 3.02(n)), (5) submit monthly to the owner "a progress report on construction, personnel, contractual commitments, and significant developments and other matters affecting or relating to each Development Phase and the Project as a whole," (§ 3.02(r)), (6) "consult with Owner on all matters subject to the Approval Rights" [virtually everything] (§ 3.02(s)), (7) "permit the Owner to (i) inspect and audit records of the Development Manager pertaining to the Project [and] (ii) consult with the personnel of the Development Manager on matters pertaining to the Project ..." (§ 3.02(u)), (8) "make recommendations to Owner with respect to any change orders" (§ 3.02(aa)), (9) "schedule and attend regular meetings with Owner ... as ... Owner deems appropriate or necessary in the interest of the Project" (§ 3.02(bb)), (10) "consult with, and assist Owner on, Lender's requirements" (§ 3.02(gg)), (11) "direct the gathering and transmitting to Owner of all documents, guarantees, warranties, affidavits, waivers and releases of lien and all other written matter in any way, manner or respect relating to, affecting or evidencing the Project" (§ 3.02(hh)), and (12) "If Development Manager becomes aware of any material defect or fault in the Project or any material nonconformance with the Plans and Specifications or any inadequacies or potential prob-

lems in the processing of or obtaining Governmental Approvals, Development Manager shall give prompt written notice thereof to Owner and make recommendations to Owner for corrective actions." (§ 3.04.)

In addition, Article VII of the Development Agreement empowered Sky Valley to inspect, audit, and copy, without limitation, the books and records related to the project that were maintained by ATX. ATX further promised, in Article VIII, to keep confidential all information related to the project and to Sky Valley. In that same Article, ATX also acknowledged Sky Valley's ownership and full power over all documents and "other material and data ... incident to the Project." In addition, ATX promised to deliver to Sky Valley at the close of the project all such information, documents and data (this obligation would not have matured only if the sale of the land to Sky Valley had not been completed, but that sale was completed at about the time the parties executed the Development Agreement).

These specific provisions, coupled with the communication obligations that are implicit in the section of the Development Agreement that conferred on Sky Valley the right to approve in advance every major aspect of the project, imposed on ATX a duty to share with Sky Valley (directly or through its counsel) every item of information that arguably had any bearing on the status or fate of any significant aspect of the project. This duty was broad enough to reach all the communications that ATX now contends it never would have made had it not believed that it was a Luce Forward client. Because the contract *required* ATX to make the subject communications, we reject the suggestion that they would not have been made but for ATX's alleged understanding that it was Luce Forward's client.

The fact that ATX was contractually obligated to communicate so fulsomely with Sky Valley also is of considerable significance when we consider the underlying policies that drive privilege doctrine. As noted above, the principal purpose of the attorney-client privilege is to encourage parties to communicate fully and openly with their

counsel. Because ATX had an independent contractual obligation to so communicate with Sky Valley (and, derivatively, with its counsel), a finding that ATX also was a client of Luce Forward would add virtually nothing to the flow of communication from ATX to Sky Valley or Luce Forward. Stated differently, on the facts of this case it would not advance the purposes of the privilege to hold that there was an attorney-client relationship between ATX and Luce Forward.

On the other hand, a decision that such a relationship existed might do considerable harm to the communication interests that privilege doctrine is designed to promote by discouraging a party like Sky Valley, which clearly was Luce Forward's client, from making full disclosures in private to its counsel. If Sky Valley had foreseen the possibility that ATX would be deemed a joint client of Luce Forward, Sky Valley either would have had to be much more guarded in its communications with Luce Forward (especially in light of the many past tensions between ATX and Sky Valley and the real possibility of future conflicts between these two parties) or would have had to hire a second, separate law firm to serve as a source of confidential legal advice on matters related to the project and ATX. The latter alternative might be the only appropriate course of action in cases where it is reasonable, under all the circumstances, for another party to believe that it also is represented by the same lawyer; but in a case like the one at bar, where such a belief could not be reasonably held, there is no justification for imposing the substantial economic and efficiency burdens that would necessarily result from a party hiring two separate law firms to deal with heavily overlapping matters.

Our conclusion that it was not reasonable for ATX to infer that it and Sky Valley were "joint" clients of Luce Forward is further supported by the fact that these two parties were on decidedly *unequal* footing with respect to contractually based rights of access to information from one another. As indicated previously, the terms of the Development Agreement gave Sky Valley extremely broad and penetrating rights of access to information that was subject to ATX's control and that was related in virtually any way to the project. In sharp and readily apparent contrast, that same Development Agreement conferred on ATX only very limited rights of access to information controlled by Sky Valley. There are only three provisions in the Development Agreement that conferred on ATX any rights of access to information controlled by Sky Valley—and even their combined effect was limited. The most significant such provision is in section 5.02(c), which required Sky Valley, after the end of each calendar quarter, to submit to ATX an accounting statement setting forth the income and any net profit from the project (ATX was entitled to a percentage of net profits, after certain returns had been received by Sky Valley). To equip ATX to understand and to protect its interests with respect to such accountings, this section of the Development Agreement further provided that ATX was "entitled, upon reasonable notice, to inspect the books and records of Owner ... for the purpose of reviewing the calculation of Net Profit for such quarter." The other two provisions that created rights in ATX to information from Sky Valley were appreciably narrower: section 5.02(c) required Sky Valley to provide ATX with copies of checks and invoices if Sky Valley were to pay any project costs directly, and section 6.03 created reciprocal rights in Sky Valley and ATX to review the insurance policies related to the project that the other party maintained.

Even read generously, these three provisions conferred on ATX a right of access to information held by Sky Valley that was *much* narrower than the comprehensive rights of access to information held by ATX that Sky Valley enjoyed under the Development Agreement. Given this large and obvious disparity, a reasonable party in ATX's situation would have understood that Sky Valley might well generate and maintain considerable information related to the project that ATX would never see—and could not expect to see.

This contractually based inequality of access to information represents one important respect in which the case at bar is materially distinguishable from one of the most visible

kinds of cases in which California courts have applied the joint client exception: cases involving disputes between former partners. In those cases the partnership relationship gave rise to reciprocal obligations between the partners to share fully with one another all information relevant to the matters in which they shared interests as partners. For example, in *Wortham & Van Liew v. Superior Court,* 188 Cal.App.3d 927, 233 Cal. Rptr. 725 (4th Dist.1987), the court, in explaining its holding that the joint client exception applied in the partnership setting, emphasized that "partners owe to one another . . . obligations of good faith, fair dealing. All partners are entitled to access to a wide range of partnership information, whether or not that information is generated under the aegis of the partnership's attorney." *Id.,* at 932, 233 Cal.Rptr. 725. Supporting this point, the *Wortham* court quoted the following passage from section 15020 of the California Corporations Code: "Partners shall render on demand true and full information of all things affecting the partnership to any partner. . . ." *Id.,* note 3, 233 Cal.Rptr. 725. For other cases that emphasize the importance (to a finding that the joint client exception applies) of the existence of equal and reciprocal duties of disclosure and access to information, see also *McCain v. Phoenix Resources, Inc.,* 185 Cal.App.3d 575, 230 Cal. Rptr. 25 (1st Dist.1986); *Roberts v. Heim,* 123 F.R.D. 614 (N.D.Cal.1988). The fact that the contract between the parties in the case at bar clearly did *not* create equal and reciprocal duties of disclosure and rights of access, but, instead, created visible inequalities in favor of Sky Valley and only limited rights for ATX makes it less reasonable for ATX to have inferred that it and Sky Valley were joint clients of Sky Valley's counsel, Luce Forward.

This same explicit inequality of access to information (and of power) also reinforces the inference that Sky Valley did not have the kind of fiduciary relationship to ATX that has played such a key role in California cases that have upheld the joint client exception to the privilege. In two of the most significant kinds of cases where California courts have upheld this exception, i.e., cases pitting former partners against one another and cases pitting insurance carriers against their former clients, a key factor in the courts' reasoning has been the existence of fiduciary obligations running from the party seeking to invoke the privilege to the party seeking to penetrate the privilege. See, e.g., *Wortham,* 188 Cal.App.3d 927, 233 Cal.Rptr. 725; *McCain,* 185 Cal.App.3d 575, 230 Cal.Rptr. 25; *Glacier General Assurance Co. v. Superior Court,* 95 Cal.App.3d 836, 157 Cal.Rptr. 435 (2d Dist.1979). The fiduciaries in these cases clearly had a duty to pursue and protect the interests of the insured or the limited partner; as fiduciaries, they held positions of trust under which the best interests of the insured or the limited partner clearly were to take precedence over any self interest of the fiduciary. It is these special obligations to elevate the interests of others, in cases of potential conflict, that clearly have made the courts hostile to efforts by the one-time fiduciary to block the other party's access to communications related to matters of common interest.

In the case at bar, however, it is not at all clear that the contract between the parties made Sky Valley a fiduciary of ATX, at least not in any sense that is fairly equatable with the fiduciary relationships that the courts have found in the insurance and partnership settings. In fact, it is much more persuasively arguable that the relevant provisions of the Development Agreement created fiduciary obligations in ATX that ran in favor of Sky Valley. The only explicit use of the term "fiduciary" occurs in section 3.01, which provides, among other things, that *ATX* "shall act as a fiduciary with respect to any assets of Owner under [ATX's] supervision, management, control or direction." Moreover, while the contract clearly imposes duties on Sky Valley (e.g., to fund the project at certain levels and to compensate ATX under specified terms), most of the obligations are imposed on ATX and run in favor of Sky Valley. And it is ATX that explicitly "covenants with [Sky Valley] to act with reasonable care and due diligence, and in good faith, with best efforts . . . in the performance of [ATX's] responsibilities under this Agreement." *Id.* It also is noteworthy in this context that in section 4.03, which speci-

fied that ATX would function as an independent contractor (presumably to protect Sky Valley from certain obligations vis-a-vis workers, suppliers, and contractors), ATX explicitly promised that it would "not represent to any party that [Sky Valley] and [ATX] are partners, co-venturers, principal and agent, or in any relationship other than that of independent contractors to [Sky Valley]." While this provision may undermine to some extent an argument that ATX was a fiduciary of Sky Valley, it also, and more clearly, supports the conclusion that ATX could not reasonably have understood this contract to have created a fiduciary relationship in favor of ATX.

Thus, when we consider the Development Agreement as a whole, especially the fact that such a large percentage of it is devoted to detailing ATX's obligations, and when we further consider the specific language of the individual provisions in the Agreement that are most pertinent to this inquiry, we conclude that ATX could not reasonably have believed that this contract created the kind of fiduciary relationship that has led California courts to uphold the joint client exception to the attorney-client privilege.

There are additional aspects of the relationship between ATX and Sky Valley that reinforce this inference. According to uncontradicted declarations,[20] Sky Valley and Luce Forward self-consciously divided their communications about the project into two categories: the first included those communications that were intended to be shared with or participated in by ATX, and the second included those communications between Luce Forward and Sky Valley that were to remain fully confidential, excluding ATX altogether. There was considerable communication in each category. Some of the fully private communication addressed matters with respect to which there were tensions between Sky Valley and ATX. But most significantly, *ATX knew*, during the project development period, that Luce Forward lawyers and representatives of Sky Valley engaged repeatedly and extensively in private communications

related to many aspects of the project, the project in which ATX insists it had a huge economic interest. Despite that interest, ATX never even intimated that there was anything unusual or objectionable about excluding ATX from such communications. Nor did ATX ever (until now, some two years after its affiliation with the project ended) seek access to any of those numerous private communications. That fact takes on even greater significance when we recall that there appears to have been considerable tension between Sky Valley and ATX with respect to the timing and the circumstances under which the project should be sold—tension that one would expect to provoke more than passing curiosity in ATX about what Luce Forward and Sky Valley were communicating to one another. In this setting, the fact that ATX never attempted to penetrate or interfere with private communications about the project between Sky Valley and its counsel constitutes further evidence that ATX did not perceive itself as being jointly represented by Luce Forward.

We do not mean to suggest, of course, that ATX and Sky Valley did not have some significant interests in common. Both had made major commitments to the project, and both stood to lose or earn considerable money depending on how the project turned out. But these economically significant commonalities of interest cannot be legally sufficient to invoke the joint client exception to the attorney-client privilege. To hold otherwise would jeopardize legitimate attorney and client expectations in a wide range of settings—and would unjustifiably require parties far too often to bear the expense and strain of retaining two sets of lawyers. To ensure that the joint client exception has reasonable boundaries we must consider, as we have above and as we do below, other aspects of the relationship between parties like ATX and Sky Valley.

■ In ruling on the applicability of the joint client exception, courts also should take into account the history of the relationship between the parties, the extent and character

**20.** See, e.g., Declaration of Franklin Sove, filed July 21, 1993; Second Declaration of Dan L. Chambers, filed July 21, 1993; Second Declaration of Thomas A. May, filed July 21, 1993; Second Declaration of Robert D. Buell, filed July 21, 1993.

of any tensions in their relationship or of any asymmetry in their interests, and the likelihood and foreseeability of conflicts arising between the parties in the future. We hasten to acknowledge that the existence of some asymmetry of interests and/or the possibility of future disputes by no means foreclose the possibility that the joint client exception applies. As noted above, California courts have held that this exception applies to relationships between insurance carriers and their insureds, even though there is virtually always some potential tension between the interests of such parties.[21]

On the other hand, when the issue is whether it was reasonable for a party in a given situation to believe that it was jointly a client of the other party's lawyer, it makes little sense for the courts to completely ignore the implications of actual or potential conflicts between the two parties, especially conflicts that are directly connected with the matters as to which the parties are alleged to have common interests. Because one of the essential conceptual predicates for the "joint" client exception is commonality of interest, a showing that there has been, is, or is likely to be considerable conflict of interest between the two pertinent parties would be one consideration, in this multi-factored analysis, tending to support a conclusion that it was unreasonable for one of the parties to believe that it was jointly a client of the other party's lawyer.

In the case at bar the parties have mutually exclusive views about the existence or at least the magnitude of tensions between their interests and about the likelihood that any such tensions would ripen into real conflicts. As noted above, it is indisputable that ATX and Sky Valley had some significant interests in common. It also is indisputable that there were significant, visible tensions between the parties during the negotiations that preceded the execution of the Development Agreement. ATX contends, however, that after the disputes surrounding those negotiations were resolved, the two parties operated as a tightly knit "team" on this project (just as they allegedly had operated in two earlier undertakings of roughly comparable character, if not size), virtually always perceiving their interests as fully symmetrical and mutually reinforcing. Sky Valley, on the other hand, alleges that even after the parties signed the Development Agreement there remained substantial and obvious tensions between them with respect to some important project-related matters, most notably about how soon and in what state of development the real property should be sold.

While the court is inclined to find Sky Valley's characterization of the relationship between the parties during the development phase of the project more likely accurate than ATX's, we need not resolve the specific disputes about the character and magnitude of tensions between these parties in order to rule on this motion. It is sufficient, for current purposes, to look to the plain terms of the Development Agreement. We perceive, in the undisputed content and structure of the parties contractual relationship, sufficient potential adversity of interest to make it unnecessary to resolve the specific factual differences that emerge from the parties' declarations. Simply stated, the Development Agreement imposed on ATX a huge list of substantial and often complex obligations to Sky Valley. Given the magnitude and density of these obligations, and the economic value of the project generally, there obviously was much more than a *di minimis* possibility that disputes would arise between the parties over whether ATX had breached some of these obligations. Evidence of that foreseeability appears in provisions of the Agreement dealing with defaults and terminations, requirements for insurance, indemnification, attorney's fees, and representations and warranties. The Agreement also built in processes for addressing disputes about accountings both of profits and of allegedly reimbursable expenses.

While we acknowledge the difference between hindsight and foresight, we nonethe-

---

21. As noted earlier in the text, the principal basis for upholding the joint client exception in cases between insureds and their carriers is the fiduciary relationship between carrier and insured. We have found no analogous fiduciary relationship in the case at bar (i.e., no such relationship running in favor of ATX).

less believe that the pendency of the case at bar constitutes some additional evidence of the potential for adversity in the relationship between these parties. We point in particular to the content of ATX's counterclaim. In that pleading ATX alleges that, during the period in issue in this motion, Sky Valley breached duties to reimburse ATX for certain post-closing expenses (allegedly covered in the contract) and for certain project attorney's fees. The counterclaim also alleges that a dispute over some $300,000 in alleged reimburseables arose between the parties in connection with the closing of the sale of the land to Sky Valley just before the development phase commenced. Most significantly, ATX goes on to allege that it was only through "coercion and duress," and over the 'adamant objection' of ATX, that Sky Valley got ATX to capitulate in this dispute.[22] This obviously rocky start should have made it more obvious to ATX that its and Sky Valley's interests might well collide during the development stages of the project. Finally, we point out again that when both Sky Valley and ATX were named as defendants in litigation arising out of the project, Luce Forward refused to represent ATX and insisted, because of potential conflicts of interest, that ATX be separately represented. Taken together these adversities of interest, actual and potential, reinforce our conclusion that it was not reasonable for ATX to believe that Sky Valley's lawyer was also ATX's lawyer on matters related to the project.

Having considered the relationships between ATX and Luce Forward and between ATX and Sky Valley, and having considered the implications of the two possible rulings on this motion for the policies that inform attorney-client and joint client privilege doctrine, we turn at this juncture to consider the implications for the policies that inform the joint client *exception* to that privilege. We conclude that a finding that ATX was a joint client of Luce Forward would not appreciably promote the policy interests that underlie the joint client exception. A finding that ATX was a joint client would not advance the interest in discouraging abuses of fiduciary

relationships because Sky Valley was in no material sense a fiduciary of ATX. Nor would such a finding contribute meaningfully to the goal of encouraging parties to honor legal duties to share information related to common interests. As we pointed out above, under the contract that established the relationship between these parties, ATX was entitled to only a very limited kind of information from Sky Valley: primarily information related to accounting of profits and insurance. ATX had no contractual basis for expecting access to other information—and certainly no contractual basis for access to private communications between Sky Valley and its lawyer. Thus the dispute before us does not implicate Sky Valley's limited legal duty to provide information to ATX.

We also have concluded that upholding ATX's invocation of the joint client exception would not prevent unjustifiable inequality of access to information necessary to resolve the project-related disputes between these parties. As emphasized above, the *contract* that established the relationship between these parties created very substantial inequalities in access to information related to the project. Given the visibility and magnitude of that inequality, ATX could not reasonably have expected unrestrained access to all of Sky Valley's information and communications about the project. Moreover, independent of the parties' contractually-based expectations, we are not persuaded that refusing to uphold the joint client exception in this case is likely to cause any unfairness to ATX. After all, the privilege that we refuse to penetrate blocks access only to communications, not to underlying information, data, or documents. Without penetrating Sky Valley's privilege, ATX has full access to the underlying documents, data, direct testimony about what the facts are. Sky Valley can use the privilege, in other words, only to prevent access to confidential communications, not to underlying evidence or facts, even if privileged communications alluded to such evidence or facts. See, generally, Rice, *Attor-*

---

22. See ¶¶ 154–157 of the "ANSWER, COUNTERCLAIMS AND THIRD–PARTY PETITION," filed

*ney–Client Privilege in the United States, supra,* at 285–379.

After considering all the circumstances, and for the reasons set forth above, we hold that ATX could not have reasonably believed at any time that it was a joint client of Luce Forward. We therefore DENY defendants' motion to compel.

IT IS SO ORDERED.